J. PAUL SMYERS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4557-69-4559-69. Filed November 8, 1971.

---

[1] The cases of the following petitioners are consolidated herein: Doris G. Smyers, docket No. 4558-69; and L. E. Pietzker and Marita J. Pietzker, docket No. 4559-69.

*Robert S. Newkirk* and *Michael M. Gibson*, for the petitioners.
*John W. Dierker*, for the respondent.

FAY, *Judge:* The respondent determined deficiencies in the Federal income taxes of the petitioners as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 4557–69 | 1964 | $1, 299. 09 |
| | 1965 | 5, 874. 86 |
| 4558–69 | 1964 | 1, 325. 18 |
| | 1965 | 6, 032. 94 |
| 4559–69 | 1964 | 4, 210. 55 |
| | 1965 | 12, 239. 53 |

After certain concessions by each party, the following questions remain for our consideration: (1) Whether advances in the form of loans made by the petitioners were capital contributions to a corporation; (2) whether bank loans made to a corporation and guaranteed by the petitioners were in fact capital contributions from the petitioners to that corporation; (3) whether the petitioners' corporation issued stock pursuant to a plan adopted under section 1244 [2] while that corporation was in the process of liquidation; (4) whether the advances made by the petitioners were made in the ordinary course of the petitioners' trade or business; and (5) whether the petitioners are entitled to an investment credit arising from the acquisition of property by the petitioners from the corporation upon its liquidation.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioners L. E. and Marita J. Pietzker are husband and wife, and at the time of filing the petition herein they were residents of Dallas, Tex. Their joint Federal income tax returns for the calendar years 1964 and 1965 were filed with the district director of internal revenue at Dallas, Tex. L. E. Pietzker will sometimes hereinafter be referred to as Pietzker.

---

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

The petitioners J. Paul and Doris G. Smyers are husband and wife and at the time of filing the petitions herein they were residents of Dallas, Tex. Their individual Federal income tax returns for the calendar years 1964 and 1965 were filed with the district director of internal revenue at Dallas, Tex. J. Paul Smyers will sometimes hereinafter be refered to as Smyers. Any references hereinafter to the petitioners will be to Pietzker and Smyers.

Smyers and Pietzker were equal partners of the Southern Co. from its formation in August 1951 until its dissolution on July 31, 1969. Throughout this period the petitioners, through their partnership, were active in the conduct of various types of businesses. The petitioners at various times were factory representatives and distributors of equipment for oil companies, distributors of air-conditioning equipment, manufacturers of light poles, and real estate entrepreneurs.

In December 1963 Danny Krause (hereinafter referred to as Krause), a design engineer in Fort Worth, Tex., was aware of an anodizing business in Fort Worth which was in the process of ceasing operations. Krause met with the petitioners at the anodizing plant on December 19, 1963. The petitioners discussed the potential of the business with the plant manager and Tom Meek, a former purchasing agent for Bell Helicopter Co. Meek assured the petitioners that he could generate sufficient business to make the anodizing plant profitable. The petitioners then decided to acquire the business.

The petitioners began the anodizing business on December 19, 1963, when a lease agreement with an option to purchase the assets was executed with the former owners of the business. The lease called for a $500 monthly payment. The petitioners exercised the option to purchase in August 1964. They intended to run this anodizing business as a corporation. On December 27, 1963, Southern Anodizing, Inc. (hereinafter referred to as Southern Anodizing), was, under the laws of the State of Texas, granted a certificate of incorporation.

Pursuant to its articles of incorporation Southern Anodizing was authorized to issue up to 100,000 shares of common stock with a par value of $1 per share. No other class of stock was authorized to be issued by such corporation.

On January 7, 1964, a total of $1,000 cash was paid to Southern Anodizing by Smyers and Pietzker, and Southern Anodizing issued therefor 1,000 shares of its stock to five shareholders as follows:

| Name | Shares owned |
| --- | --- |
| J. Paul Smyers | 425 |
| L. E. Pietzker | 425 |
| D. F. Krause | 50 |
| Gene Smyers | 50 |
| Gordon D. Harriman | 50 |

No cash contribution was made to Southern Anodizing by Krause, Gene Smyers, or Gordon D. Harriman for issuance to them of the stock.

Through the period beginning in March 1964 and ending with the dissolution of Southern Anodizing, various amounts were advanced on open account to, or paid on behalf of, Southern Anodizing by the petitioners' partnership, Southern Co. One repayment of $2,000 was made to Southern Co. on October 19, 1964. The net amount advanced by Southern Co. to Southern Anodizing was $46,366.19 and of this amount $16,700 had accumulated before any assets were purchased from the former owners of the business. These advances were made on open account and not evidenced by any certificates of debt. They were simply book entries by each entity involved. There were no maturity dates and no interest charges.

On the following dates the Republic National Bank of Dallas (hereinafter referred to as Republic National Bank), on three separate occasions, loaned money to Southern Anodizing in return for promissory notes duly executed by Southern Anodizing:

1. January 7, 1964, $10,000 was loaned at 5-percent interest with a maturity date of July 7, 1964.

2. August 31, 1964, $25,000 was loaned at 5½-percent interest with a maturity date of March 2, 1965.

3. March 18, 1965, $10,000 was loaned at 5½-percent interest with a maturity date of June 8, 1965.

The foregoing obligations were renewed and extended periodically as they matured. During 1964 Southern Anodizing made accrued interest payments to Republic National Bank in the sum of $329.17 on the January 7, 1964, bank loan of $10,000, and during 1965 Southern Anodizing made accrued interest payments to Republic National Bank in the sum of $978.54 on the January 7, 1964, and August 31, 1964, bank loans.

The total of the aforesaid notes of Southern Anodizing payable to Republic National Bank was $45,000. The said notes were unsecured; however, the bank did hold the guarantee of both Smyers and Pietzker on the entire amount of the loans.

During June 1965 the outstanding stock owned by Gene Smyers and Gordon D. Harriman was purchased at its par value by Smyers and Pietzker, increasing their stock ownership in Southern Anodizing to 475 shares each. At the same time an offer was made by the petitioners to purchase Krause's outstanding stock. This offer was refused by Krause.

From the inception of the anodizing business in December of 1963 through its sale in June 1970, Smyers spent approximately 95 per-

cent of his time operating the anodizing business in Fort Worth. During the time the anodizing business was operated in the corporate form Smyers received no compensation from the corporation for services rendered. The first few years of operation did not prove profitable; however, both Smyers and Pietzker continued to be optimistic about the prospects for the anodizing concern.

In July of 1965 the petitioners determined that additional capital was required to put Southern Anodizing in better financial condition. On July 12, 1965, an annual meeting of the stockholders of Southern Anodizing was held. After discussing the corporation's future, the stockholders authorized the board of directors to issue new stock for the purpose of raising needed capital. Such additional stock was to be issued in conformity with section 1244, thereby entitling the purchasers to the advantages provided to investors in small business corporations by this section of the law. Should this plan not generate adequate additional financing the board was then authorized to sell the entire assets of the corporation at the best price obtainable.

Following the stockholders meeting the annual meeting of the board of directors of Southern Anodizing was held. At this meeting a plan to issue section 1244 stock was adopted. The plan authorized the corporation to offer and issue 99,000 shares of common stock, each share having a par value of $1. All of the requirements of section 1244 were fulfilled by the plan the board adopted. A second resolution was adopted, authorizing the board to accomplish the sale of the corporate assets if the new stock issue did not raise sufficient funds.

In July of 1965 Smyers and Pietzker each obtained a personal loan of $17,500 from Republic National Bank. The proceeds of these loans, along with an additional $20,000 of the petitioners' personal capital, were used to purchase additional stock in Southern Anodizing.

On July 29, 1965, a total of $55,000 cash was paid to Southern Anodizing in equal proportions by Pietzker and Smyers for the issuance of 55,000 shares of its $1 par stock authorized under the section 1244 plan. Southern Anodizing recorded the transaction by a debit to cash for $55,000 and a credit to capital stock in the same amount. The shares were issued on July 30, 1965, one-half (27,500) to Smyers and one-half (27,500) to Pietzker.

After the purchase of the 55,000 shares by the petitioners there were still 44,000 shares of authorized unissued stock. Krause was given an opportunity to purchase these shares but chose not to participate.

Southern Anodizing issued two checks dated July 28, 1965; one for $35,000 payable to Republic National Bank, constituting a payment of $35,000 of the $45,000 bank loans referred to previously, and one for $20,000 payable to Southern Co. which was treated as a repayment of the advances previously referred to.

The $55,000 raised by the issuance of stock proved insufficient to cover all of Southern Anodizing's financial needs. A special meeting of the board of directors of Southern Anodizing was held on August 31, 1965. The board determined that the best interests of the company would be served by dissolution of the company effective October 1, 1965. Between August 31, 1965, and September 20, 1965, Krause threatened to sue Smyers and Pietzker on the grounds that this new issue of stock, coupled with the board's recommendation of dissolution, had disadvantaged his minority shareholder position.

A special meeting of the shareholders of Southern Anodizing was held on September 20, 1965, for the purpose of considering the board's recommendation of dissolution. Once again Krause declined an offer to purchase any of the remaining authorized unissued 44,000 shares of stock. Because of the lack of adequate financing and the presence of a now dissident shareholder, a majority of the shareholders adopted a resolution dissolving Southern Anodizing and authorizing the officers to dispose of the assets at the best terms for the corporation. The voting by which such resolution was carried was as follows: For: 55,950 shares owned by Smyers and Pietzker. Against: 50 shares owned by Krause. Southern Anodizing was liquidated and dissolved on September 20, 1965.

Southern Co. acquired all of the assets and assumed all of the liabilities of Southern Anodizing. Among the assets acquired were the following, along with the cost to Southern Co. of acquiring each individual asset:

| Item | Cost | Item | Cost |
|------|------|------|------|
| Forklift | $1,708.50 | Office equipment | $790.18 |
| Anodizing equipment | 21,824.50 | Fan | 148.67 |
| Compressor | 705.13 | Air conditioner | 316.10 |
| Rectifier | 204.00 | | |

Each of the above assets had a useful life of at least 8 years as of the time of its acquisition by Southern Co. The petitioners claimed an investment credit for the above-listed assets.

At the time of the liquidation the amount shown on the books and records of both companies as owed by Southern Anodizing to Southern Co. totaled $36,974.73. This figure consists of the unrepaid advances and the liabilities assumed by Southern Co. in the liquidation. During the course of the liquidation there was a further advance by Southern Co. on behalf of Southern Anodizing of $366.19 made to cover outstanding checks of Southern Anodizing. The assets distributed by Southern Anodizing to Southern Co. were in the amount of $35,170.86. The excess of the total amount shown on the Southern Co.'s records as advances to Southern Anodizing over the net assets received by the petitioners is $2,170.06.

At the time of dissolution Southern Anodizing, due to its prior poor business record, had a net operating loss carryforward of $35,-077.55. The petitioners were fully aware of the fact that this loss carryover would be lost to the corporation as a result of the liquidation of Southern Anodizing.

At no time was there ever any intention on the part of Smyers and Pietzker to cease the operation of the anodizing business. In fact Southern Co. continued the anodizing business without interruption. The business prospered and in the following years showed sizable profits of:

| | |
|---|---|
| 1966 | $26, 917. 78 |
| 1967 | 40, 406. 46 |
| 1968 | 93, 335. 35 |

On their Federal income tax returns for the calendar year 1965 the petitioners claimed a deduction for an ordinary income loss of $55,000 resulting from the sale of section 1244 stock and a deduction for an ordinary loss on unrecoverable advances of $2,170.06. The petitioners also claimed an investment credit of $1,873.62. In his notices of deficiency the Commissioner disallowed the ordinary-loss deductions and reduced the investment credit by the sum of $1,798.81.

### OPINION

The question before this Court involves the status of stock issued by Southern Anodizing. The parties have agreed that the second issue of stock complied with all of the formal requirements of section 1244.

The petitioners contend that the stock also meets the definitional requirements of section 1244 and the loss incurred on its disposition was ordinary loss. However, the respondent contends that the stock was issued in exchange for an equity interest instead of money or other property and therefore it does not meet the definition of section 1244 stock.

Under section 1244(a) [3] a loss on the sale or exchange of stock which would otherwise be a capital loss is treated as an ordinary loss if the stock disposed of meets the requirements of section 1244. One of the elements of the definition of section 1244 stock is that the stock must be issued in consideration for money or other property (not including stock or securities). [4] The regulations promulgated under section 1244

---

[3] SEC. 1244. LOSSES ON SMALL BUSINESS STOCK.

(a) GENERAL RULE.—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

[4] SEC. 1244(c). SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

\* \* \* \* \* \* \*

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities) \* \* \*

provide that stock issued in consideration for stock or securities, including stock or securities of the issuing corporation, cannot qualify as section 1244 stock.[5]

The purpose of section 1244, which was introduced in the Small Business Tax Revision Act of 1958, was "to increase the volume of outside funds which will be made available for the financing of small business. Encouragement for external financing is provided by the ordinary loss treatment accorded investments in small business which do not prove to be successful." H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 710.

The legislative history makes it clear that the congressional intent behind excluding stock or securities of the issuing company as proper consideration for section 1244 stock is that in many cases the equity interest which would be exchanged for the section 1244 stock would be an already existing equity interest in the issuing corporation. In such cases no new capital is being generated. Capital funds already committed are merely being reclassified for tax purposes. See *Hollenbeck* v. *Commissioner*, 422 F. 2d 2 (C.A. 9, 1970), affirming 50 T.C. 740 (1968); *Raymond G. Hill*, 51 T.C. 621 (1969); *Wesley H. Morgan*, 46 T.C. 878 (1966), and cases cited therein.

Our primary concern is whether the advances made by Southern Co. or the guaranteed loans made by Republic National Bank were capital contributions from the petitioners to Southern Anodizing. If either of these interests were equity interests then at the time the new stock was issued such new stock was not issued for money and does not meet the definition of section 1244 stock. In such a circumstance, while the form of the transaction may have been an issuance of stock for a reputed cash payment of $55,000 followed by a "loan repayment" by the corporation, the substance of the transaction is in fact an exchange of one form of equity interest for another. It is the substance of the economic relationship, not the form in which it is cast, that determines the incidence of Federal income tax. *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

First, we will deal with the advances directly made from Southern Co. to Southern Anodizing. Ambiguities and uncertainties have long existed in tax law in distinguishing between a debt interest and an equity interest in a corporation. "Decisions must be based on a wide variety of considerations * * * no simple test for the resolution of debt-equity questions has ever emerged." *Tyler* v. *Tomlinson*, 414 F. 2d 844, 847 (C.A. 5, 1969).

---

[5] Sec. 1.1244(c)–1(f) *Issued for money or other property.* (1) The stock must be issued to the taxpayer for money or other property transferred by the taxpayer to the corporation. However, stock issued in exchange for stock or securities, including stock or securities of the issuing corporation, cannot qualify as section 1244 stock * * *

In applying the criteria so far expressed by the courts we find the advances by Southern Co. clearly were capital contributions on behalf of the petitioners. Therefore, $20,000 of this stock was not issued for money, but merely exchanged for another equity interest.

The petitioners may very well have intended that these advances be considered as loans. However, the court in *United States* v. *Snyder Brothers Co.*, 367 F. 2d 980 (C.A. 5, 1966), certiorari denied 386 U.S. 956 (1967), held in effect that objective intent as manifested by the actions which took place controlled over subjective intent.

The objective intent of the petitioners was manifested by the following characteristics:

1. The corporation had an initial capital structure of $1,000. There was an option to purchase all of the assets needed for the anodizing business which was in fact exercised shortly after the corporation started business. This corporation was inadequately financed from the start. Immediately $10,000 was borrowed from the bank, and of the $46,366.19 in advances $16,700 had accumulated before the purchase of the assets. Undercapitalization may also be evidenced by the fact that the funds advanced by the petitioners were used for the acquisition of the "core assets" of the business. See *Dillin* v. *United States*, 433 F. 2d 1097, 1102 (C.A. 5, 1970). While thin capitalization alone does not justify designating indebtedness as capital, *Rowan* v. *United States*, 219 F. 2d 51 (C.A. 5, 1955), it is a factor to be thrown into the hopper.

2. There were no certificates of indebtedness, simply entries on the books of each entity.

3. There was no maturity date; the advances were made on open account. One of the most important of the formal factors of debt is a provision for a relatively fixed time when the purported creditor is unconditionally entitled to require payment of the principal. See *Wood Preserving Corporation of Baltimore* v. *United States*, 347 F. 2d 117, 119 (C.A. 4, 1965); *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39, 47 (C.A. 2, 1962), remanding on other grounds 35 T.C. 268 (1960).

4. No interest was charged to the corporation. "This factor is indicative of a capital contribution, because a true lender is concerned with interest." *Curry* v. *United States*, 396 F. 2d 630, 634 (C.A. 5, 1968), certiorari denied 393 U.S. 967 (1968).

5. Of further significance is the fact that Smyers, one of the purported creditors, was engaged full time in the management operation of the corporation, and there was a complete identity of interest between creditor and shareholder. See *Tyler* v. *Tomlinson, supra* at 849.

6. While there is no direct evidence that the advances of Southern Co. were subordinated to the bank loan, the practical effect of the

petitioners' guarantees of those bank loans is that this other debt would have been satisfied at the expense of their recovery. See *Diamond Bros. Co. v. Commissioner*, 322 F. 2d 725, 732 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court.

Where, as here, there are capital insufficiency, lack of a maturity date, lack of interest charges, participation in management by one of the creditors, identity of creditor and shareholder interest, and an indirect subordination of the creditors' position to that of another creditor, we find the advances were risk capital and not bona fide loans.

The second issue involves the guaranteed bank loans. As to these the respondent contends the bank in effect made the loan to the guarantor shareholders, who in turn contributed this sum to capital. This Court cannot agree with such an analysis. The loans by Republic National Bank, guaranteed by the petitioners, were bona fide debt obligations of Southern Anodizing at the time they were created. Consequently $35,000 worth of stock issued under the section 1244 plan was issued for money.

We are not unaware of the fact that the form of these advances as that of a guaranteed loan does not negate the possibility that there was actually a capital contribution. See *Santa Anita Consolidated, Inc.*, 50 T.C. 536, 550 (1968). However, "Whether such debt is to be treated as an indirect capital contribution must be resolved by an investigation of the facts in light of traditional debt-equity principles." [6] See also *Fors Farms, Inc. v. United States*, an unreported case (W.D. Wash. 1966, 17 A.F.T.R. 2d 222, 66–1 U.S.T.C. par. 9206) ; and *Murphy Logging Co. v. United States*, 378 F. 2d 222 (C.A. 9, 1967).

The $46,366.19 in advances from Southern Co. to Southern Anodizing we have found to be a capital contribution by the petitioners. Therefore, at the time these bank loans were made, thin capitalization was not an important factor, for the petitioners' equity interest in Southern Anodizing was substantial.

The loan instruments evidenced an unconditional obligation to pay a fixed sum on a fixed maturity date. The debts bore a fixed rate of interest payable unconditionally and interest payments were in fact made. The debt was unsubordinated and carried no voting right. Under State law Republic National Bank looked first to Southern Anodizing for payment on these loans, and the guarantee of the shareholders would not be enforced until it was shown that the corporation was un-

---

[6] While it is true that the Court in *Santa Anita Consolidated, Inc.*, 50 T.C. 536, 550 (1968), was deciding whether the petitioner could deduct money paid in connection with a guarantee of a bad debt or whether this was merely a capital loss of equity capital, the legal principle is the same as the one before this Court in this case.

able to meet its obligations.[7] While it is reasonable to assume that these unsecured loans would not have been made without petitioners' guarantee, this factor alone does not warrant a finding of an equity interest. See *Santa Anita Consolidated, Inc., supra; Jack Daniel Distillery* v. *United States*, 379 F. 2d 569 (Ct. Cl. 1967) ; and *C. M. Gooch Lumber Sales Co.*, 49 T.C. 649 (1968).

Having found that the guaranteed bank loans were debt at the time of their creation, we proceed to the respondent's next contentions. The respondent contends that the corporate liquidation was in process at the time this section 1244 stock was issued, and therefore the transaction was not within the congressional purpose of section 1244.[8] Furthermore, the respondent claims in light of the ruling in *Hollenbeck* v. *Commissioner, supra*,[9] that the $35,000 of guaranteed debt had changed its debt characteristic to that of equity as a result of this liquidation process.

We find neither of the respondent's contentions valid. Southern Anodizing was not in the process of liquidation when the section 1244 stock was issued; therefore, the stock issued for the $35,000 in cash met all the requirements of section 1244. Moreover, there was a valid business purpose for the issuance of this section 1244 stock. This transaction was not merely an attempt to convert an anticipated economic loss, of a capital nature, into an ordinary loss deduction. *Raymond G. Hill, supra*. At the time the section 1244 plan was adopted the petitioners definitely intended to continue the operation of the anodizing business. The petitioners believed the business was going to be successful and this belief was in fact proved correct. In July 1965, when the plan was adopted, the anodizing business was in need of additional funds to aid a continuing business operated in the corporate form. This is the express purpose of section 1244. The fact that the corporation was subsequently liquidated is inapposite here.

---

[7] See Tex. Rev. Civ. Stat. Ann., arts. 1986, 1987 ; see also *Zimmerman* v. *Bond*, 392 S.W. 2d 149 (Tex. Civ. App. 1965).

[8] In *Wesley H. Morgan*, 46 T.C. 878 (1966) ; *Bruce* v. *United States*, 409 F. 2d 1317 (C.A. 5, 1969) ; and *Raymond G. Hill*, 51 T.C. 621 (1969), the corporations issuing the sec. 1244 stock were in the process of liquidation. The courts found that the purpose of sec. 1244 was not being accomplished when the effect of the transaction was not to encourage the flow of new risk funds into an operating business but rather to provide a means by which a loss which would otherwise have been a capital loss is converted into an ordinary loss.

[9] In *Hollenbeck* v. *Commissioner*, 422 F. 2d 2 (C.A. 9, 1970), affirming 50 T.C. 740 (1968), the shareholders of the corporation decided to cease operations in September. They then proceeded to convert their debt obligations in the corporation to stock issued under section 1244 in December. A formal dissolution of the corporation was accomplished immediately after this conversion. The court found that at the time of the conversion the shareholder's debt obligations had become so irrevocably committed to the corporation as a result of this liquidation procedure that they could no longer be characterized as debt. The new stock was therefore not issued for cancellation of shareholder's debt, but rather in exchange for an equity interest. This is not the case before us.

Krause was offered a chance to buy as much as 44,000 shares of stock. Texas State law at that time required a vote of at least 80 percent of the outstanding shares of the corporation to effect a voluntary dissolution.[10] If Krause had purchased only 20,000 of these shares he could have effectively prevented a dissolution. This Court is not persuaded that a party ultimately planning to liquidate a corporation would place a dissident shareholder in a position to prevent that liquidation.

The petitioners needed additional financing for Southern Anodizing. They issued stock under a section 1244 plan. Krause not only refused to purchase any of this stock but began threatening legal action as a minority shareholder. The petitioners then decided to liquidate and dissolve Southern Anodizing because it was still underfinanced and now a dissident noncontributing shareholder had to be eliminated. In fact, the petitioners felt the need to eliminate Krause as a shareholder was so great that they were willing to have the corporation forfeit a substantial net operating loss carryforward of $35,000.

There is no merit in the petitioners' alternative position that the loss from any of the $57,170.06 in advances is an ordinary deductible loss resulting from advances made in the ordinary course of a trade or business. The petitioners are not correct in directing us to section 165(c)(1) or (c)(2)[11] for justification of this premise.

The deduction for such a loss is granted under section 165(a). Sections 165(c)(1) and (c)(2) merely limit the loss in the case of individuals. See sec. 1.165-1(e), Income Tax Regs.[12] Characterization of such a loss is dependent on other factors.

The advances by Southern Co. were equity contributions and were not made by the petitioners in their capacity as entrepreneurs engaged in the trade or business of loaning money or in the trade or business of promoting, organizing, financing, and managing business enterprises. We hold on the facts that while the petitioners ran various

---

[10] Tex. Bus. Corp. Act Ann., art. 6.03A (1956).

[11] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business \* \* \*

[12] Sec. 1.165-1(e). Limitation on losses of individuals. In the case of an individual, the deduction for losses granted by section 165(a) shall, subject to the provisions of section 165(c) and paragraph (a) of this section, be limited to:

(1) Losses incurred in a trade or business;

(2) Losses incurred in any transaction entered into for profit, though not connected with a trade or business \* \* \*

businesses through the partnership, they looked to the profits generated by the individual enterprises, not to profits expected from the sale of each enterprise.

The instant case is clearly within the Supreme Court's holding in *Whipple* v. *Commissioner*, 373 U.S. 193 (1963), that one advancing funds to his corporation is not engaged in the trade or business of advancing funds where the purpose of his investment is to gain dividends or enhancement of the value of the investment.

The final issue for our disposal is whether the respondent erred in determining that the petitioners should not be allowed an investment credit in 1965 in the amount of $1,798.81. The Southern Co. acquired various assets from Southern Anodizing in the liquidation sale. For purposes of the investment credit these assets constitute used section 38 property under section 48(c)(1) [13] if the property is acquired by a purchase.

Section 48(c)(3)(A) [14] defines "purchase" for purposes of the investment credit by referring to the definition assigned to such term by section 179(d)(2). The question here is whether the assets Southern Co. acquired were acquired by purchase within the meaning of section 179(d)(2). Section 179(d)(2)(A) [15] defines purchase as any acquisition of property, but only if the property is not acquired from a person whose relationship to the person acquiring such property would result in the disallowance of losses under section 267.

---

[13] SEC. 48. DEFINITIONS; SPECIAL RULES.

(c) USED SECTION 38 PROPERTY.—

(1) IN GENERAL.—For purposes of this subpart, the term "used section 38 property" means section 38 property acquired by purchase after December 31, 1961, which is not new section 38 property. Property shall not be treated as "used section 38 property" if, after its acquisition by the taxpayer, it is used by a person who used such property before such acquisition (or by a person who bears a relationship described in section 179(d)(2)(A) or (B) to a person who used such property before such acquisition).

[14] SEC. 48(c). USED SECTION 38 PROPERTY.—

*        *        *        *        *        *        *

(3) DEFINITIONS.—For purposes of this subsection—

(A) PURCHASE.—The term "purchase" has the meaning assigned to such term by section 179(d)(2).

[15] SEC. 179. ADDITIONAL FIRST-YEAR DEPRECIATION ALLOWANCE FOR SMALL BUSINESS.

(d) DEFINITIONS AND SPECIAL RULES.—

*        *        *        *        *        *        *

(2) PURCHASE DEFINED.—For purposes of paragraph (1), the term "purchase" means any acquisition of property, but only if—

(A) the property is not acquired from a person whose relationship to the person acquiring it would result in the disallowance of losses under section 267 or 707(b) (but, in applying section 267(b) and (c) for purposes of this section, paragraph (4) of section 267(c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants),

The respondent's position is that section 267 [16] provides that losses are disallowed between an individual and a corporation where more than 50 percent in value of stock is owned directly or indirectly by or for such individual. Furthermore, section 267(c) [17] provides that for this purpose each partner is considered as owning the stock owned by his partner and therefore the prohibited relationship existed in the present case.

It is the petitioners' contention that for the purpose of defining "purchase" as used in section 179(d)(2), one does not look to section 267 only for the prohibited relationship. Rather, one must look to the entire section to determine whether or not a loss would be disallowed when such a prohibited relationship exists. In holding for the respondent, we find that section 267's only purpose here is to delineate the prohibited relationships.

The legislative history of the investment credit appears to focus on the relationship aspect only.[18]

The proper analysis of Congress' intention as to the definitional section 179(d)(2) depends on whether the emphasis is to be placed on the word "relationship" as the respondent propounds or the words "result in the disallowance of losses" as the petitioners contend. This depends on the meaning assigned to the term "purchase" within the context of section 179. See sec. 48(c)(3)(A), *supra*.

Section 179 was added to the 1954 Code in 1958 by Pub. L. 85–866 (Sept. 2, 1958) as part of the Small Business Tax Revisions Act. This

---

[16] SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.

(a) DEDUCTIONS DISALLOWED.—No deduction shall be allowed—

(1) LOSSES.—In respect to losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).

\*     \*     \*     \*     \*     \*     \*

(b) RELATIONSHIPS.—The persons referred to in subsection (a) are:

\*     \*     \*     \*     \*     \*     \*

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

[17] SEC. 267(c). CONSTRUCTIVE OWNERSHIP OF STOCK.—For purposes of determining, in applying subsection (b), the ownership of stock—

\*     \*     \*     \*     \*     \*     \*

(3) An individual owning (otherwise than by the application of paragraph (2)) any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner;

[18] H. Rept. No. 1447, 87th Cong., 2d Sess., 1962–3 C.B. 405, 413, 414:

because of the greater dependence of small business on used property, a limited credit is also made available for used property which is newly acquired.

\*     \*     \*     \*     \*     \*     \*

\* \* \* To prevent abuse, however, there has been omitted from the term "used property," available for the credit that which is used by \* \* \* a person who is *related* to a person who used the property before its present acquisition). [Emphasis added.]

was a bill to aid and encourage small business. The purpose of section 179 as stated in the House committee report was to "make it possible for small business to use depreciation reserves for expansion. * * * This also should encourage additional investment in small business since it provides for a faster recovery of capital before the taxing of earnings."[19]

Section 179 allows the taxpayer to elect to take an additional 20-percent depreciation allowance only for the first taxable year for which a depreciation deduction under section 167 is allowable. The property subject to this "bonus" depreciation allowance is tangible personal property, new or used, having a useful life of at least 6 years.[20]

This additional allowance, unlike the depreciation allowance under section 167, is determined without proration based on the period of time the section 179 property has been in service during the taxable year. See sec. 1.179–1, Income Tax Regs.[21] It is therefore possible to acquire section 179 property, secure the additional depreciation deduction, use the property for a rather short period of time, and pass it on to another taxpayer who may also benefit from the same item.[22] To prevent a possibly abusive situation Congress limited the deduction to property acquired from an unrelated person.[23] In order to determine

[19] H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 712.

[20] SEC. 179. ADDITIONAL FIRST-YEAR DEPRECIATION ALLOWANCE FOR SMALL BUSINESS.

(a) GENERAL RULE.—In the case of section 179 property, the term "reasonable allowance" as used in section 167(a) may, at the election of the taxpayer, include an allowance, for the first taxable year for which a deduction is allowable under section 167 to the taxpayer with respect to such property, of 20 percent of the cost of such property.

\* \* \* \* \* \* \*

(d) DEFINITIONS AND SPECIAL RULES.—

(1) SECTION 179 PROPERTY.—For purposes of this section, the term "section 179 property" means tangible personal property—

(A) of a character subject to the allowance for depreciation under section 167,

(B) acquired by purchase after December 31, 1957, for use in a trade or business or for holding for production of income, and

(C) with a useful life (determined at the time of such acquisition) of 6 years or more.

[21] Sec. 1.179–1 Additional first-year depreciation allowance.

(b) *Proration not required.* The allowance under section 179 is determined without any proration based on the period of time the section 179 property has been in service during the taxable year. For example, taxpayer A, who makes his income tax returns on the calendar year basis, purchased and placed in service on August 7, 1958, section 179 property costing $8,000. A elects to claim the additional first-year depreciation on the total cost of $8,000. A is entitled to a deduction of $1,600 (20 percent of $8,000) under this section for 1958, without proration for the number of days in 1958 during which the property was in service.

[22] Sec. 1.179–1(e), Example (1). M Corporation, which makes its income tax returns on the calendar year basis, purchases section 179 property costing $10,000 on December 27, 1960, places it in service on the same date, and does not use an averaging convention in determining the depreciation allowance. Since depreciation is allowable for the December 27–31, 1960, period, M Corporation may elect to claim the additional first-year depreciation allowance of $2,000 (20 percent of $10,000) for 1960.

[23] "Further restrictions limit the property for which the fast write-off can be taken to that which is acquired from an unrelated person" H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 712.

just what relationships Congress intended to be prohibited relationships for purposes of section 179, we must examine the applicability of the exception for corporate liquidations found in section 267.

In turning to section 267, we find that the reason behind the "absolute prohibition * * * against the allowance of losses on any sales between the members of certain designated groups" [24] is that transfers between group members with an identity of economic interests were usually not thought to result in economically genuine realizations of loss. See *McWilliams* v. *Commissioner*, 331 U.S. 694, 699 (1947). The one exception to this strict general rule is the case of an exchange of stock in a corporate liquidation.

The Second Circuit's interpretation of this exception is found in *McCarthy* v. *Conley*, 341 F. 2d 948, 953 (C.A. 2, 1965) :

Ordinarily, the sale of stock is the same as the sale of any other property. Yet, in the case of a total liquidation, there is no difficulty in determining whether or not a loss has been incurred by all the members of the family who joined the corporation's venture. This could account for the exception in section 267(a).

To hold that this exception to the strict rule of section 267 applies to the additional first year depreciation allowance would be anomalous.

We do not believe that Congress intended that an exception, which is appropriate in the context of section 267, should necessarily be used in section 179 or in the investment credit area. Such a result would have the effect of allowing both the corporation and the related shareholder to claim the additional depreciation or investment credit on the same asset if acquired in a liquidation but not in a sale or exchange. Such a policy would promote corporate liquidations in order to obtain additional benefits. This was not the intent of the Small Business Tax Revision Act of 1958 or the investment credit provisions. Upon liquidation of a controlled corporation the corporate shareholders become the direct owners of the transferred assets. No new assets have been purchased; there is no additional investment generated. This is not a proper situation for the additional depreciation deduction or an additional investment credit.

*Decisions will be entered under Rule 50.*

---

[24] *McWilliams* v. *Commissioner*, 331 U.S. 694, 699 (1947).