MARVIN R. ADAMS, JR., AND JEANNE H. ADAMS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12238–78.     Filed April 3, 1980.

*Joseph C. Ferrell*, for the petitioners.
*Avery B. Cousins III*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined a deficiency of $22,995 in petitioners' Federal income tax for the year 1975.

---

[2]See *Meshulam v. Commissioner*, T.C. Memo. 1976–111.

At issue is whether petitioners can treat the loss on their corporate stock as an ordinary loss under section 1244[1] when the stock had been previously issued to a third party, later repurchased by the corporation which returned it to the status of authorized but unissued stock, and then resold it to petitioners.

This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are set forth below.

Marvin R. Adams, Jr., and Jeanne H. Adams (petitioners) resided in Bradenton, Fla., at the time they filed their petition in this case. They filed a joint Federal income tax return for 1975 with the Internal Revenue Service Center, southeast region, Chamblee, Ga.

In early 1973, W. Carroll DuBose (DuBose) helped found Adams Plumbing Co., Inc. (Adams Plumbing), whose offices are located in Margate, Fla. Adams Plumbing was incorporated in Florida on July 25, 1973. It had an authorized capital of 100 shares of common stock, with a par value of $1 per share. The corporate minutes show that the stock was issued to DuBose on July 25, 1973. The first officers were William R. Adams (brother of petitioner Marvin R. Adams, Jr.), president, and J. Lucille Adams, secretary.

On August 5, 1974, DuBose was elected chairman of the board of directors of Adams Plumbing, and William R. Adams was elected a director. As of that date, William R. Adams was still the president of the corporation, and then also became vice president; Francine Adams was the secretary-treasurer.

On February 10, 1975, Adams Plumbing repurchased the 100 shares from DuBose. On the same day, William R. Adams purchased 10 of the 100 shares of Adams Plumbing.

On February 11, 1975, the corporation, pursuant to State law, retired its remaining 90 repurchased shares to the status of authorized but unissued stock. In addition, a written plan complying with the procedural requirements of section 1244 was adopted to issue these 90 shares as section 1244 stock. The corporation at that time was a small business corporation as defined in section 1244.

---

[1]All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year at issue, unless otherwise indicated.

On March 1, 1975, Adams Plumbing and petitioners (denominated Rodney J. Adams and Jean Adams in the agreement) entered into a sales agreement[2] for 80 of the 90 shares. Pursuant to the terms of the agreement, 80 shares of the corporate stock were issued to petitioners in their joint names on August 1, 1975. They paid $120,000 for the 80 shares. The 80 shares have been held continuously since August 1, 1975.

On August 9, 1975, the remaining 10 shares were sold to

---

[2]

### AGREEMENT

THIS AGREEMENT made this 1st day of March, 1975, by and between ADAMS PLUMBING COMPANY, INC., a Florida Corporation, (hereinafter referred to as Corporation) and RODNEY J. ADAMS and JEAN ADAMS, husband and wife, (hereinafter referred to as Purchasers).

WHEREAS, the parties mutually agree to sell and purchase stock in the Corporation for sums and amounts and times to be set forth herein.

NOW THEREFORE, the parties mutually agree as follows:

1. The Purchasers shall purchase a maximum of 80 shares of common stock in the Corporation for an amount not to exceed a total purchase price of $120,000.

2. Upon receipt of monies by the Corporation, the Directors shall issue stock to RODNEY J. ADAMS, JR. and JEAN ADAMS, husband and wife, in their joint names for $1,000 per each share of stock for the first 60 shares. The remaining 20 shares shall be purchased at $2,700 per share.

3. The Purchasers shall make payments to the Corporation for the purchase of the first 60 shares in various amounts over the next four months and shall have paid in the full purchase price for the 60 shares on or before June 20, 1975.

4. The remaining 20 shares shall be purchased over the subsequent six months at an average purchase price of $2,700 per share and the entire shares must be paid in full on or before December 31, 1975.

5. In further consideration for the sale of said shares of common stock of the Corporation, the Purchasers either jointly or individually, shall loan the Corporation various sums to insure the ongoing of the Corporation not to exceed the sums of $60,000 at the prevailing interest rate in Bradenton, Florida for loans of like kind and duration. The term of this loan or any loans made under this Paragraph shall not extend for more than five years and shall not be in any balloon payment form. The parties agree that the said loans that shall be made from time to time may be made by demand note or installment note of shorter duration than herein stated.

6. The parties agree that William R. Adams is to be the President of the Corporation and manage all operations of the Corporation for the benefit of the Stockholders involved in the Corporation with full authority to make contracts without restriction except as set forth in the By-Laws of the Corporation and as determined and ratified by the Board of Directors.

7. All shares that are issued to the Purchasers under this Agreement shall be voted exclusively by Mr. William R. Adams and this Agreement is to serve as a proxy at any Stockholders meeting whether Special or Annual and shall represent the shares as Attorney-in-fact to act on all matters to come before the Corporation without exception under any and all conditions. This proxy expires upon written notification to the Purchasers of non-representation of shares by Mr. William R. Adams. Otherwise, this proxy shall terminate on December 31, 1975 of each year and from year to year after December 31, 1975. Renewal of this option shall be made by written notice to Mr. William R. Adams by the Purchasers that the proxy is to be re-instated for the subsequent year and placed with the Corporate Record Book.

Richard F. Wynkoop and his wife, Marlene. Richard Wynkoop was a friend of petitioner Marvin R. Adams, Jr.

An outline of the stock issued by Adams Plumbing is as follows:

| Stock certificate No.– | Number of shares | Recipient | Date of transfer |
|---|---|---|---|
| 1 | 100 | W. Carroll DuBose[1] | 7/25/73 |
| 2 | voided | --- | --- |
| 3 | voided | --- | --- |
| 4 | 10 | William R. Adams | 2/10/75 |
| 5 | voided | --- | --- |
| 6 | 10 | Richard R. and Marlene B. Wynkoop | 8/9/75 |
| 7 | 60 | Rodney Adams, Jr., and Jean Adams[3] | 8/1/75 |
| 8[2] | 20 | Rodney Adams, Jr., and Jean Adams[3] | 8/1/75 |
| 9 | 20 | Rodney Adams, Jr., and Jean Adams[3] | 8/1/75 |

[1] Sold back to Adams Plumbing Co., Inc., on 2/10/75.

[2] This certificate is missing; joint stock certificate No. 9 was issued to replace No. 8.

[3] Rodney Adams, Jr., is petitioner Marvin R. Adams, Jr., and Jean Adams is petitioner Jeanne H. Adams.

The common stock of Adams Plumbing became worthless in the year 1975. On their joint Federal income tax return for 1975, the petitioners claimed a loss on their investment in Adams Plumbing. They claimed $50,000 as an ordinary loss under the provisions of section 1244, and an additional $70,000 as a capital loss on worthless securities on the Schedule D attached to the return.

On April 20, 1976, Francine Adams tendered her resignation as secretary-treasurer of Adams Plumbing, and William R. Adams tendered his resignation as president, vice president, and director of the corporation.

Section 1244 provided during the year involved herein that in the case of an individual, a loss on "section 1244 stock" issued to such individual shall be treated as an ordinary loss to the extent of $50,000 for a husband and wife filing a joint return.[3]

[3] SEC. 1244. (a) GENERAL RULE.—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a

One of the elements of the definition of section 1244 stock is that the stock must be issued by the corporation, pursuant to a plan, for money or other property other than stock and securities. Sec. 1244(c)(1)(D). The regulations promulgated under section 1244 provide that in order to claim a deduction under section 1244 the individual "must have continuously held the stock from the date of issuance." Furthermore, an individual who acquires stock from a shareholder by purchase, gift, devise, or in any other manner is not entitled to an ordinary loss under section 1244 with respect to such stock.[4]

---

loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

(b) MAXIMUM AMOUNT FOR ANY TAXABLE YEAR.—For any taxable year the aggregate amount treated by the taxpayer by reason of this section as a loss from the sale or exchange of an asset which is not a capital asset shall not exceed—

(1) $25,000, or

(2) $50,000, in the case of a husband and wife filing a joint return for such year under section 6013.

(c) SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan.

(B) at the time such plan was adopted, such corporation was a small business corporation, ·

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 242, 243, 244, and 245) exceed the amount of gross income.

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

[4]Sec. 1.1244(a)–1(b), Income Tax Regs., provides as follows:

(b) *Taxpayers entitled to ordinary loss.* The allowance of an ordinary loss deduction for a loss on section 1244 stock is permitted only to the following two classes of taxpayers:

(1) An individual sustaining the loss to whom such stock was issued by a small business corporation, or

(2) An individual who is a partner in a partnership at the time the partnership acquired such stock in an issuance from a small business corporation and whose distributive share of

The stipulation of facts and the attached exhibits show that petitioners purchased common stock from Adams Plumbing, a corporation qualified as a small business corporation under section 1244. The corporation had initially sold all of its 100 authorized shares of common stock to DuBose in 1973. On February 10, 1975, the corporation repurchased the 100 shares from DuBose, and then sold 10 of the 100 shares to William R. Adams. The remaining 90 shares were retired to the status of authorized but unissued stock.[5] On the next day, February 11, 1975, the corporation adopted a written plan under section 1244 to issue the 90 shares.

On March 1, 1975, petitioners contracted to buy 80 shares of the corporation's common stock with the consideration to be paid before December 31, 1975. The purchase contract provided that the parties agreed that Marvin's brother, William R. Adams, was president of the corporation, managed all operations, and that

---

partnership items reflects the loss sustained by the partnership.

In order to claim a deduction under section 1244 the individual, or the partnership, sustaining the loss, must have continuously held the stock from the date of issuance. A corporation, trust, or estate is not entitled to ordinary loss treatment under section 1244 regardless of how the stock was acquired. An individual who acquires stock from a shareholder by purchase, gift, devise, or in any other manner is not entitled to an ordinary loss under section 1244 with respect to such stock. Thus, ordinary loss treatment is not available to a partner to whom the stock is distributed through the partnership. Stock acquired through an investment banking firm, or other person, participating in the sale of an issue may qualify for ordinary loss treatment only if the stock is not first issued to such firm or person. Thus, for example, if the firm acts as a selling agent for the issuing corporation the stock may qualify. On the other hand, stock purchased by an investment firm and subsequently resold does not qualify as section 1244 stock in the hands of the person acquiring the stock from the firm.

[5]11 W. Fletcher, Cyclopedia of the Law of Private Corporations, sec. 5088 (1971 rev.):

"Under the rule generally prevailing a corporation has the option either to retire reacquired shares and restore them to the status of authorized but unissued shares, or to carry them as "treasury stock," that is, treat them as being still issued and subject to resale."

H. Henn, Handbook, Law of Corporations 290–291 (2d ed. 1970):

"The capital of a corporation is generally computed on the basis of the shares issued.

"Not all of the authorized shares, of course, need be issued. Unissued shares might be reserved for property additions, to secure additional funds for share dividends, exercise of share options, or exercise of conversion privilege in securities convertible into shares.

"Shares which have been issued to the holders thereof are said to be outstanding. When such shares are reacquired by the corporation, by donation, forfeiture, purchase, redemption, conversion, or otherwise, they are frequently called "treasury stock" or "treasury shares". The accounting treatment should be descriptively accurate from the point of view of the applicable corporation law.

"Legally, "treasury shares" are authorized and issued but not outstanding. However, the corporation may and, under certain circumstances, must restore the shares to unissued status or eliminate the shares from authorized shares by reducing the authorized capital. [Fn. refs. omitted.]"

the petitioners' stock was to be voted exclusively by William R. Adams on all matters under any and all conditions.

On August 1, 1975, the corporation issued two certificates of stock to petitioners pursuant to the contract: one certificate for 60 shares and the other for 20 shares. Petitioners held these shares in their joint names continuously from August 1, 1975. The stock became worthless in December 1975.

On these facts, the petitioners argue that they are entitled to ordinary loss treatment under section 1244 on their stock because section 1244(a), section 1244(c)(1)(D), and section 1.1244(a)–1(b), Income Tax Regs., state only that the stock must be issued to an individual and such individual must hold the stock continuously from the date of issuance. Petitioners contend that they have in fact held stock issued by the corporation continuously from the date of issuance to the date of loss. They argue that it is irrelevant that DuBose held all the stock of the corporation prior to its resale back to the corporation and that the corporation retired the stock from treasury stock into authorized but unissued stock.

Because neither the Internal Revenue Code nor the regulations expressly prohibit, or even address, shares which were previously issued to a third party, then reacquired by the corporation, and retired to the status of authorized but issued, from being eligible for section 1244 stock, petitioners contend that the loss incurred qualifies for section 1244 treatment. They assert that to require a corporation to have additional shares authorized, rather than using authorized but unissued shares which have been retired from treasury shares, would be a useless and needless act for section 1244 eligibility and is not specifically required by the law or the regulations.

Stock bought from a stockholder does not qualify as section 1244 stock. Sec. 1244(c)(1); sec. 1.1244(a)–1(b), Income Tax Regs. Petitioners argue that a corporation which sells authorized but unissued stock which had been retired from treasury stock is not a shareholder for the purposes of section 1244 because the corporation possessing such stock of its own has none of the powers or duties that the term shareholder or stockholder implies.[6] Moreover, petitioners deny that the corporation served

---

[6]Florida Stat. sec. 608.13(9)(b), in force at the time of the purchase of shares in 1975, provides that "Shares of its own capital stock owned by the corporation shall not be voted directly or

as a conduit for the sale of stock from DuBose to them. They argue that respondent has not alleged that the funds received by DuBose, the prior shareholder, were identical to those paid by petitioners. They point out that on the same day the corporation purchased all its stock from DuBose, William R. Adams purchased 10 shares from the corporation, thus supplying some capital to the corporation. The corporation then adopted a plan to issue section 1244 stock and operated for almost 5 months before receiving final payment for petitioners' 80 shares.

Respondent contends that because the stock was originally issued to DuBose on July 25, 1973, when he bought all 100 shares of the corporation's authorized stock and DuBose held this stock for over 1½ years until he sold it back to the corporation on February 10, 1975, petitioners have not "continuously held the stock from the date of issuance" as required by section 1.1244(a)–1(b), Income Tax Regs. In so contending, respondent reads the words of the regulation "date of issuance" to mean "date of *first* issuance."

We think this contention is wide of the mark.[7] When a corporation retires reacquired shares pursuant to State law to the status of authorized but unissued stock, anyone purchasing such stock from the corporation in a bona fide transaction will be the original holder of the stock. To hold otherwise would require investors in small businesses to pour over the minutes of every board of directors meeting researching the entire stock issuance history looking for tainted stock. This would create unnecessary complications and confusion, especially where the corporation not only retired repurchased (or donated or forfeited or other reacquired) shares to authorized but unissued status but also increased its authorized number of shares.

Respondent also argues that the corporation here acted merely as a conduit for the sale of shares from DuBose to petitioner. He contends that allowance of an ordinary loss in

---

indirectly, or counted as outstanding for the purpose of any stockholders' quorum or vote." 11 W. Fletcher, Cyclopedia of the Law of Private Corporations, sec. 5088 (1971 rev.), states that "Treasury shares carry no voting rights or rights as to dividends."

[7]Compare another provision of sec. 1.1244(a)–1(b), Income Tax Regs., which states: "Stock acquired through an investment banking firm, or other person, participating in the sale of an issue may qualify for ordinary loss treatment only if the stock is not *first* issued to such firm or person." (Emphasis supplied.)

such a situation under section 1244 would run contrary to the legislative purpose of section 1244.

Respondent's support for this argument is found in the following legislative history of the Small Business Tax Revision Act of 1958 which enacted section 1244, Pub. L. 85–866, 72 Stat. 1676:

> This section provides ordinary loss rather than capital loss treatment on the sale or exchange of small-business stock. This treatment is available only in the case of an individual and only if he is the original holder of the stock.
>
> This provision is designed to encourage the flow of *new* funds into small business. The encouragement in this case takes the form of reducing the risk of a loss for these *new* funds. [H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 711.] [Emphasis supplied.]

We agree with respondent. Instead of a flow of new funds into a small business, the minimal facts of this case indicate only a substitution of capital. In the situation of an ongoing business, we think Congress wanted to encourage the flow of additional funds rather than the substitution of preexisting capital before the benefits of section 1244 could be bestowed. This concern is also reflected in the regulations which deny section 1244 treatment where a stockholder has stock issued to him before the enactment of section 1244 and exchanges such stock for a new issuance of stock after the corporation adopts a valid plan but without the stockholder putting in any new capital. Sec. 1.1244(c)–1(f)(2), example (*i*), Income Tax Regs., states:

> A taxpayer owns stock of Corporation X issued to him prior to July 1, 1958. Under a plan adopted after June 30, 1958, he exchanges his stock for a new issuance of stock of Corporation X. The stock received by the taxpayer in the exchange may not qualify as section 1244 stock even if the corporation has adopted a valid plan and is a small business corporation.

Petitioners have the burden of proof here. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. They have failed to introduce any evidence that there was a net increase in the corporation's capital by virtue of their purchase of stock. They contracted to buy the stock at a set price within 3 weeks after the corporation had repurchased it from DuBose. The stock was plainly not "old and cold." Petitioner's brother, William, was at all relevant times president of the corporation and controlled it from February 10, 1975, until August 1, 1975, by being its sole shareholder, and from August 1,

1975, until the stock became worthless in December 1975, by holding petitioners' voting proxies.[8] Despite so close a relationship between the corporation and themselves, petitioners offered no evidence to show a new flow of funds into the corporation. The stipulation of facts is silent on the reasons DuBose wanted to sell, the financial terms of DuBose's sale of the stock back to the corporation, and the financial condition of the corporation before and after the sale. We cannot conclude from the stipulated facts that there has been a new and fresh infusion of capital within the legislative purpose of section 1244.

Petitioners appear to contend that such a requirement could easily be circumvented by having the corporation authorize new stock, issue the new stock for new funds and then immediately use the proceeds to redeem the old shareholders. The regulations provide that an individual who acquired stock from a shareholder by purchase, gift, devise, or *in any other manner* is not entitled to an ordinary loss under section 1244. Sec. 1.1244(a)–1(b), Income Tax Regs. Courts have not closed their eyes to events immediately subsequent to a stock sale. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Smyers v. Commissioner*, 57 T.C. 189 (1971), the taxpayers' controlled corporation issued purported section 1244 stock for cash. The corporation then immediately used a portion of the proceeds to repay the taxpayers for advances they had previously made to the corporation. In holding that the taxpayers were not entitled to ordinary loss treatment under section 1244, when stock was issued for an already existing equity interest, we said:

> The legislative history makes it clear that the congressional intent behind excluding stock or securities of the issuing company as proper consideration for section 1244 stock is that in many cases the equity interest which would be exchanged for the section 1244 stock would be an already existing equity interest in the issuing corporation. In such cases no new capital is being generated. Capital funds already committed are merely being reclassified for tax purposes. * * * [57 T.C. at 196.]

Accordingly, the petitioners must treat the loss on their

---

[8]William R. Adams officially tendered his resignation as president, vice president, and director of Adams Plumbing on Apr. 20, 1976.

corporate stock as a capital loss rather than an ordinary loss under section 1244.

*Decision will be entered for the respondent.*