DALE E. MAGEE AND ELLEN F. MAGEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Magee v. Commissioner
Docket No. 13314-90
United States Tax Court
T.C. Memo 1993-305; 1993 Tax Ct. Memo LEXIS 310; 66 T.C.M. (CCH) 105; 93-2 U.S. Tax Cas. (CCH) P47,873; July 14, 1993, Filed *310 Decision will be entered under Rule 155. Dale E. Magee, pro se. For respondent: Richard A. Stone. PARKER
PARKER
MEMORANDUM OPINION PARKER, Judge: Respondent has determined a deficiency in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Taxable Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1985
$ 20,360
$ 1,018
*
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issues remaining for decision are: (1) Whether petitioners are entitled to a deduction, pursuant to section 1244, for a loss based upon the stock of United Agri-Services, Inc.; (2) Whether advances of money made by petitioners to United Agri-Services, Inc., represent bona fide loans or contributions to capital; (3) Whether petitioners were in the business of making loans, *311 and if so, whether, in connection with such a business, petitioners incurred deductible business bad debts; (4) Whether respondent properly determined the amount of petitioners' rental income; and (5) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations. *312 Petitioners claim various deductions in their petition and on brief that they had not claimed on their 1985 tax return. We will discuss these deductions under the appropriate headings below. Most of the issues in this case are essentially factual, mainly involving the nature of certain activities of petitioners and whether petitioners have substantiated the amounts of any deductible items. For convenience, our findings of fact and opinion on each issue will be combined, but each issue will be discussed under a separate heading. General Background
Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Dale E. Magee (petitioner) and petitioner Ellen F. Magee (Mrs. Magee) are husband and wife (collectively referred to as petitioners) and resided in Fairbury, Illinois, at the time of the filing of the petition in this case. During the taxable year at issue, petitioner was the president and sole shareholder of United Agri-Services, Inc. (UAS). UAS was in the business of constructing hog confinement buildings and other farm related structures. The UAS Preorganization *313 Subscription Agreement further described the corporate purposes: said corporation shall be organized for the purpose of Designing, engineering, manufacturing, constructing, selling, servicing and marketing of environmentally controlled buildings and their component parts and interior equipment principally for the production of Agriculture livestock in the States of Illinois, Indiana, Iowa and Wisconsin and for such other purposes as the incorporators may determine[.]
Ordinary Loss Deduction for Section 1244 Stock
In 1974, UAS was incorporated under the laws of the State of Illinois. The corporation was authorized to issue 500 shares of common stock with a par value per share of $ 100. In 1974, petitioner purchased from UAS 100 shares of this common stock for $ 10,000. [2] The 100 shares represented a 20-percent ownership in UAS. Between 1974 and May of 1980, petitioner purchased the remaining 80 percent of the shares of UAS from the four other original shareholders. As of May of 1980, petitioner became the sole shareholder of UAS. He continued to be the sole shareholder during and beyond the taxable year at issue, 1985. *314 On March 22, 1985, UAS filed a petition in bankruptcy. Petitioners contend that, as a result, they incurred a $ 50,000 loss in 1985 on the 500 shares of UAS stock they owned. They claim that the stock became worthless in 1985 because the bankruptcy estate had no residual funds to pay petitioner after the claims of the other creditors had been paid. Petitioners conclude that this loss is eligible as a loss under section 1244 and that they should be allowed to deduct its value, $ 50,000, against their ordinary income. Section 1244(a) provides that, "In the case of an individual, a loss on section 1244 stock issued to such individual * * * which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as an ordinary loss." There is a limit on the amount that can be treated as ordinary loss, but any loss in this case is within such limit. Sec. 1244(b)(2). Section 1244(c) defines "section 1244 stock" as stock issued by a domestic, small business corporation for money or other property (other than stock and securities). Sec. 1244(c)(1). Section 1244(e) provides that "The Secretary shall *315 prescribe such regulations as may be necessary to carry out the purposes of this section." This Court has recognized that section 1244 was designed to provide a tax benefit to a rather limited group of taxpayers, and as a result, "qualification for those benefits requires strict compliance with the requirements of the law and the regulations promulgated pursuant to the specific instructions therefor included in section 1244(e)". Morgan v. Commissioner, 46 T.C. 878, 889 (1966). The regulations for section 1244 provide that the individual must be the person "to whom such stock was issued by a small business corporation" and "must have continuously held the stock from the date of issuance" in order to claim a loss deduction under section 1244. Sec. 1.1244(a)-1(b), Income Tax Regs.; Adams v. Commissioner, 74 T.C. 4, 8 (1980). An individual who acquires stock from a shareholder by purchase, gift, devise, or in any other manner is not entitled to an ordinary loss under section 1244 with respect to such stock. Id. Therefore, petitioner, as original issue owner of only 100 shares of UAS stock, fails to satisfy the statutory *316 and regulatory requirements with respect to the other 400 shares of UAS stock that he purchased from the other shareholders over the years. At most, petitioner may claim an ordinary loss only with respect to the 100 shares he purchased directly from the corporation. With respect to the 100 shares of stock that petitioner has owned since original issuance, the regulations contain strict reporting requirements for taxpayers who claim application of section 1244. Sec. 1.1244(e)-1, Income Tax Regs. The regulations provide that any taxpayer who is claiming a deduction for an ordinary loss for stock under section 1244 "shall file with his income tax return for the year in which a deduction for the loss is claimed a statement" that sets forth the address of the corporation that issued the stock, the manner in which the stock was acquired, and the nature and amount of the consideration paid. Sec. 1.1244(e)-1(b), Income Tax Regs. In addition, the taxpayer must maintain records sufficient to distinguish such section 1244 stock from any other stock he may own in the corporation. Id. In this case, petitioners did not file the statement required by section 1.1244(e)-1(b), Income Tax *317 Regs., with their 1985 tax return. As a result, the 100 shares of original issue UAS stock owned by petitioner fail to qualify as section 1244 stock. Cournan v. Commissioner, T.C. Memo. 1989-520; Cosgrove v. Commissioner, T.C. Memo. 1987-401; cf. Morgan v. Commissioner, 46 T.C. at 889. It follows then that petitioners are not entitled to an ordinary loss deduction pursuant to section 1244 for a loss upon the UAS stock. Schedule C Deductions
The loss reported on Schedule C of petitioners' 1985 Federal income tax return was computed by petitioners as follows: Funds from a mortgage at First Federal
Bank on petitioners' residence $ 75,000 Collateral provided by petitioners for
a loan from the Bank of Forrest 40,000 Petitioners' certificate of deposit
pledged for a loan from First Federal Bank 9,000 Alleged miscellaneous unreimbursed
corporate expenses 6,000 Less:
Petitioners' receipt of proceeds from
the sale of bonds held in the name of UAS (17,126)
Petitioners' receipt of interest on
notes of UAS (8,741) Net Loss *     $ 104,133 *318 On the Schedule C, petitioners characterized the claimed loss as "CORPORATION EXPENSES PAID BY TAXPAYER AT DIRECTION OF COURTS. EXPENSES NOT DEDUCTED BY CORPORATION". Petitioners now contend that they had a personal business proprietorship of "making loans", separate and distinct from any other business or employment, that they operated from 1980 through 1985. Petitioners claim that, by making these alleged loans, they intended to earn income from the interest generated. In the years prior to 1985, petitioners claim that they had no income or expenses from that alleged business and, therefore, did not file Schedules C for that business during those years. Petitioners now contend that, in 1985, they had business losses totaling $ 202,987.70 from their business of making loans. Petitioners claim that they gave all of their business information to their accountant who prepared their 1985 tax return. Petitioners contend that the accountant incorrectly underreported business losses on Schedule C and also mischaracterized those losses as due to the payment of UAS expenses rather than properly characterizing them as business bad debt losses. Petitioners insist that their accountant *319 also mischaracterized the nature of their business on Schedule C as "sales" rather than as "loan making". Petitioners contend that a portion of their total business losses, $ 98,553.70 ($ 202,987.70 - $ 104,434), was inexplicably omitted from Schedule C by their accountant and should now be included. Petitioners assert that these additional losses resulted from several loans made by petitioners in the course of operating their loan-making business. Petitioners further contend that these loans became worthless in 1985. Thus, petitioners conclude that the total deduction to which they are entitled on Schedule C is $ 202,987.70: Debtor
Amount of Loss
UAS
$ 124,086.93 UAS
25,000.00 UAS
10,000.00 UAS
5,000.00 Koehl
9,500.00 Hills
13,005.00 Keiner
2,500.00 Jeffcoate
13,895.77 Total Losses  $ 202,987.70 Less Stipulated Receipts  from UAS   (25,867.00)
Net Operating Loss from  $ 177,120.70 Schedule C   1. Four Loans to UAS
Petitioners first claim that they personally made four loans to UAS, evidenced by promissory notes signed by Bruce T. Lang, vice president of UAS: (1) a promissory note for $ 25,000 executed on August 3, 1981, to be repaid *320 to both petitioners in the amounts of $ 12,500 on February 3, 1982, and $ 12,500 on August 3, 1982, at an interest rate of 12 percent per year; the payment of the note was secured by four automobiles; (2) a note [3] *321 for $ 5,000 executed on May 10, 1983, at an interest rate of 10 percent a year; the note was payable to petitioner and was "due upon call"; (3) a note for $ 10,000 executed on November 1, 1984, payable to Mrs. Magee at an interest rate of 12 percent a year; the note was "due upon demand"; and (4) a note for $ 124,000 executed on January 7, 1985, payable to both petitioners at an interest rate of 14 percent and due upon demand. The record does not establish the source or sources of any funds advanced to UAS, and specifically the record does not establish that Mrs. Magee advanced any funds to UAS. [4]
On May 10, 1983, Mr. Lang, on behalf of UAS, executed an Assignment of Security Interest, assigning to petitioner all of UAS' rights, title, and interest in and to certain listed properties "in consideration for the contribution of capital" by petitioner. The document further stated that the Assignment was made to secure all notes and obligations of UAS owing to and to become owing to petitioner. UAS did not make any repayments to petitioners for any of the funds advanced to the corporation. When UAS filed for bankruptcy in March of 1985, petitioners filed a proof of claim against the estate of UAS in the amount *322 of $ 164,086.93, for "personal loans to the corporation". On January 22, 1987, the bankruptcy court presiding over the bankruptcy cases of both UAS and petitioners (in their individual capacity) issued a Notice to Creditors and Other Parties in Interest (the Notice). The Notice stated that a settlement had been reached regarding the bankrupt estates, one term of which was that petitioners had agreed that they would withdraw their claim filed against the estate of UAS in the aggregate amount of $ 168,529.14. We must first determine whether these advances of money to UAS represent bona fide loans or contributions to capital. If such advances are found to be loans, we must then determine whether, in 1985, petitioners are entitled to a deduction of the amounts advanced as business bad debts. Whether an advance to a corporation represents a loan or a contribution to capital is a question of fact. Petitioners bear the burden of proving the existence and nature of advances to a corporation. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). There are a number of factors to consider in deciding whether advances made by a shareholder to his corporation *323 are to be considered loans or contributions to capital. [5] It is difficult to articulate a single defined set of standards by which this debt-equity determination is to be made. The Supreme Court recognizes that: There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts.
John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946). Thus, we must carefully consider and balance the factors that support opposing conclusions. The question is whether petitioners had a reasonable expectation of repayment regardless of the success of UAS or whether their advances were put at the risk of the corporate venture. *324 Considering all of the facts available in this record, we conclude that the advances made to UAS were contributions to capital and were put at the risk of the corporate venture. The strongest evidence supporting petitioners' contention of the existence of loans are the documents described as promissory notes reflecting the amounts advanced by petitioners and the promise by UAS to repay at specific dates or upon demand. However, form alone, although entitled to weighty consideration, does not control the characterization of the true substance of an instrument or transaction. Baker Commodities, Inc. v. Commissioner, 48 T.C. 374, 395 (1967), affd. 415 F.2d 519 (9th Cir. 1969). Specifically, we have held that: The formal characterization as loans on the part of the controlling stockholders may be a relevant factor but it should not be permitted to obscure the true substance of the transaction. [Fn. ref. omitted.]
Dobkin v. Commissioner, 15 T.C. 31, 33 (1950), affd. per curiam 192 F.2d 392 (2d Cir. 1951). Thus, although such evidence of promissory notes *325 gives some indication that a debtor-creditor relationship may have been established, the mere fact that UAS issued documents characterizing the advances to UAS as loans does not require this Court to find that bona fide loans in fact were made. In Baker Commodities, Inc. v. Commissioner, supra, we noted that, if form alone controlled, the promissory note in question evidenced a true indebtedness. 48 T.C. at 395. As in the case at hand, the note there contained an unconditional promise to pay a specific sum, plus interest, at designated intervals or upon demand if a default occurred. Id. However, we further noted that, in determining whether a true debtor-creditor relationship arose upon the execution of the promissory note, "it is necessary to recognize the basic difference between a 'stockholder' and a 'creditor': The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks *326 so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * *
Baker Commodities, Inc. v. Commissioner, 48 T.C. at 395 (quoting Kolkey v. Commissioner, 27 T.C. 37, 58 (1956), affd. 254 F.2d 51 (7th Cir. 1958)). The actions of petitioners in this case render such evidence of promissory notes of little weight. The facts show that petitioner was acting more as the sole shareholder of UAS than as a creditor. Although the Assignment of Security Interest by UAS to petitioner refers to notes and obligations owing or to become owing to petitioner, the document also clearly refers to the advances made as contributions to the capital of the corporation. Furthermore, over the years UAS never repaid any of these advances, and petitioners have not shown that they ever attempted to collect these advances or the property securing the advances. In fact, no evidence was presented by petitioners to demonstrate that UAS truly intended to repay these advances. No explanation was offered as to why petitioners continued to "lend" money to UAS as its financial situation *327 apparently was deteriorating, especially why they made a "loan" of $ 124,000 only 2 months before UAS filed for bankruptcy protection. Thus, we conclude, in this case, that petitioner was acting as a sole shareholder, trying to prop up his failing business, rather than as a bona fide creditor. Therefore, we hold that petitioners' total advances in the amount of $ 164,086.93 to UAS were contributions to capital and cannot be treated, for tax purposes, as ordinary losses resulting from worthless business bad debts. 2. Koehl Loan
Petitioners contend that, on October 27, 1980, they loaned $ 8,960 at 11 percent annual interest to Clyde and Joanne Koehl. Repayment of principal and interest was to be made upon the sale of certain property owned by the Koehls. Petitioners assert that they had no other personal or business relationship with the Koehls. Petitioners state that, in November of 1984, they became aware that the property had been sold and asked the Koehls for payment of the note, which apparently was not forthcoming. Petitioners contend that they then made attempts to enforce the debt: their attorney sent a payment demand letter in January of 1985, and petitioners subsequently *328 hired a collection agency. These collection attempts were apparently unsuccessful and led petitioners to consider the debt worthless. When petitioners filed personal bankruptcy in 1985, they listed this debt, with a stated value of $ 9,500, on "Schedule B-2 -- Personal Property". At trial, petitioner attempted to introduce into evidence various documents purporting to substantiate this debt. Petitioner presented a copy of the note without the Koehls' signatures and a letter written by attorney Richard J. Dalton referring to his preparation of the note and his recollection that the Koehls did sign and deliver the note at a closing on October 27, 1980. Petitioner also presented a letter, dated January 24, 1985, from another attorney, Walwyn M. Trezise, referring to Mr. Trezise's efforts to collect the debt and the response he received from Clyde Koehl. Petitioner submitted an affidavit by Mr. Trezise outlining the history of this debt and the loss and destruction of the documents relating thereto. The above documents relating to the Koehl loan were not received into evidence because the drafters of these documents were not present at trial to sponsor the documents and were not *329 available for cross- examination. See California Eastern Line, Inc. v. Maritime Commission, 17 T.C. 1325, 1340-1341 (1952), pet. for review dismissed by 211 F.2d 635 (D.C. Cir. 1954), revd. on other grounds 348 U.S. 351 (1955). As they stand, these documents constitute hearsay and have not been shown to satisfy any of the exceptions to the hearsay rule. Id. Therefore, we hold that petitioners have not met their burden of proving the existence and nature of this purported loan to the Koehls and, as a result, are not entitled to any corresponding deduction. Moreover, on brief petitioners argue that the Koehl note and others "became worthless in 1985 when we lost them in our personal Chapter 7 bankruptcy". If these notes were used to satisfy petitioners' creditors, then such notes did not become worthless, and petitioners have received the full economic benefit of the note. 3. Hills Loan
On October 1, 1982, petitioners loaned $ 21,665 at 15 percent annual interest (on late payments) to George and Martha Hills. The loan was to be repaid in five annual payments of $ 4,333 each and was *330 secured by a grain bin located on the Hills' farm, which had been purchased by the Hills from UAS. [6] On brief, petitioners explain that the Hills needed help financing the purchase of the grain bin. Petitioners borrowed money from the Woodford County Bank in order to extend this financing to the Hills. Apparently, the Hills made the first two payments in 1983 and 1984 in amounts equal to the amounts owed by petitioners to the Woodford County Bank. In their personal bankruptcy, petitioners listed as their personal property the note from the Hills in the remaining amount of $ 13,005. Petitioners then explain that "Because of our own personal bankruptcy in 1985, we lost the Hills note to the Woodford County Bank who used it to offset our note to them, mentioned above." Petitioners then conclude that "this occurred in 1985, making this note worthless to us." Thus, petitioners contend that they are entitled to a business bad debt deduction in the amount of $ 13,950, presumably the remaining balance on the Hills' note, plus interest. *331 Petitioners are not entitled to such a deduction. The note was not worthless to petitioners: the Woodford County Bank accepted the note in satisfaction of petitioners' outstanding balance on their loan from the bank. In other words, petitioners were able to repay their loan from the Woodford County Bank with the Hills' note rather than cash or collateral from their own assets. The Hills no longer owed payments to petitioners but to the bank. Thus, there did not remain a debt to become worthless, and there can be no corresponding bad debt deduction. 4. Keiner Loan
On brief, petitioners contend that, on August 1, 1984, they loaned Ed Keiner $ 2,500 at 12 percent interest, repayable on demand. When petitioners filed their personal bankruptcy in 1985, they listed the Keiner note on "Schedule B-2 -- Personal Property". This schedule is the only evidence petitioners submitted to this Court to substantiate the existence and amount of this alleged loan. Such a submission is not sufficient to meet petitioners' burden of proof. Thus, petitioners have not established that they are entitled to any deduction with respect to this alleged loan. On brief petitioners argue that the *332 Keiner note and others "became worthless in 1985 when we lost them in our personal Chapter 7 bankruptcy". If this note, like the Hills' note, was used to pay petitioners' creditors, then the note did not become worthless, and petitioners in effect have received the full economic benefit of the note. 5. Jeffcoate Loan
The parties have stipulated that, in 1984, petitioners conveyed $ 10,000 to Renee Jeffcoate. However, petitioners have presented into evidence a copy of a promissory note, dated December 11, 1984, in the amount of $ 11,940 at a rate of 10 percent per annum. The note was co-signed by Renee Jeffcoate and James Fenoglio and was to be repaid 21 days after its execution (i.e., January 1, 1985); otherwise, the interest rate was to increase to 18 percent per annum. Neither Ms. Jeffcoate nor Mr. Fenoglio repaid the loan, and petitioners made numerous attempts to obtain payment. Petitioner commenced action against Ms. Jeffcoate and Mr. Fenoglio in the Circuit Court of the Seventh Judicial Circuit of Sangamon County, Illinois, and in May of 1985, submitted an affidavit to the court regarding that action. On October 23, 1985, petitioner's motion for summary judgment *333 was granted, and a judgment was entered against Mr. Fenoglio in the amount of $ 13,895.77. [7]
During this time in 1985, the Federal Bureau of Investigation (the FBI) began investigating Ms. Jeffcoate, suspecting her of certain criminal activities regarding a fraudulent loan brokering business. In September of 1985, the FBI interviewed petitioner to ascertain his knowledge of Ms. Jeffcoate's and Mr. Fenoglio's activities. In a letter dated September 9, 1987, petitioners were informed by Larry A. Mackey, an Assistant United States Attorney, that, on August 24, 1987, Ms. Jeffcoate had pled guilty to 10 Federal felony violations of wire fraud and mail fraud. Mr. Mackey stated in his letter that: At the time of sentencing I will recommend to the court that restitution be ordered. However it is unknown at this point whether Jeffcoate will have the financial capacity to make any restitution.
Petitioners claim that, despite *334 repeated efforts to collect on the judgment obtained against Mr. Fenoglio, he has claimed insolvency and has refused to pay. Petitioners further contend that these efforts occurred in 1985 and led petitioners to consider the loan and judgment uncollectible. Petitioners claim they are entitled to a business bad debt deduction in the amount of $ 13,895.77 for the taxable year 1985. Section 166 provides that a deduction shall be allowed for any bad debt that becomes worthless within the taxable year. However, section 166 distinguishes business bad debts from nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs.
Initially, petitioners have the burden of proving that (1) a bona fide debt existed between petitioners and Ms. Jeffcoate and Mr. Fenoglio and (2) the debt became worthless in 1985. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981). A bona fide debt is one that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. In determining whether a debtor-creditor relationship represented by a bona fide debt *335 exists, this Court takes a facts-and-circumstances approach and examines, on a case-by-case basis, the substantive nature of the relationship. Fisher v. Commissioner, 54 T.C. 905, 909 (1970). The basic test in making such a determination is whether the debtor is under an unconditional obligation to repay the creditor, and whether the creditor intends to enforce repayment of the obligation. Sec. 1.166-1(c), Income Tax Regs.; Fisher v. Commissioner, 54 T.C. at 909-910. Proof of worthlessness requires two showings: (1) the fact of worthlessness and (2) the timing of worthlessness. The particular facts and circumstances of the case must be considered: there is no standard test or formula for determining worthlessness within a given taxable year. Lucas v. American Code Co., 280 U.S. 445, 449 (1930); Crown v. Commissioner, 77 T.C. at 598. "However, it is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery." Crown v. Commissioner, supra. *336 Worthlessness is not established by merely demonstrating nonpayment of the debt or that collection is in doubt. To be "worthless", not only must a debt be lacking current liquid value and be uncollectible at the time the taxpayer takes the deduction, but also it must appear to be lacking any potential value and be uncollectible at any time in the future. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). [8] Furthermore, the taxpayer must have taken reasonable steps to collect the debt. He must have exhausted all usual and reasonable means of collecting a debt before worthlessness can be determined.
We find that petitioners have proved that a bona fide loan was made to Ms. Jeffcoate and Mr. Fenoglio and that repayment of the loan appeared sufficiently uncollectible and valueless in 1985 to be deemed worthless in that taxable year. Petitioners *337 have shown that all reasonable means of collection were attempted. Despite the existence of a valid judgment against Mr. Fenoglio, petitioners also have shown that, in 1985, collecting the amount owing from either Mr. Fenoglio or Ms. Jeffcoate was highly unlikely in light of their refusal to pay, their dubious activities, and the ongoing FBI investigation. Therefore, we now must consider whether this worthless debt is deductible under section 166(a) as a business bad debt or under section 166(d) as a nonbusiness bad debt. Section 166(a) provides that "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." However, section 166(d) excludes from the application of section 166(a) any nonbusiness debt, which is defined by negative implication as a debt other than (1) a debt created or acquired in connection with a taxpayer's trade or business, or (2) a debt whose loss was incurred in the taxpayer's trade or business. A nonbusiness bad debt will be treated as a loss resulting from the sale or exchange of a short-term capital asset. Sec. 166(d). If a taxpayer is to have his claimed deduction escape classification as a nonbusiness bad debt, *338 he must prove the debt was proximately related to a business in which he was engaged. Nash v. Commissioner, 31 T.C. 569, 573 (1958). The determination as to the business or nonbusiness character of the debt and the requisite proximate relationship of the debt to the business of the taxpayer involves a question of fact, and petitioners bear the burden of proof. Higgins v. Commissioner, 312 U.S. 212 (1941); Sales v. Commissioner, 37 T.C. 576, 580 (1961); Towers v. Commissioner, 24 T.C. 199 (1955), affd. 247 F.2d 233 (2d Cir. 1957). Petitioners contend that they were engaged in the business of making loans. This Court has held on numerous occasions that the right to deduct bad debts as business losses is applicable only to exceptional situations in which the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business. Rollins v. Commissioner, 32 T.C. 604, 613 (1959), affd. 276 F.2d 368 (4th Cir. 1960); *339 Barish v. Commissioner, 31 T.C. 1280, 1286 (1959); Estate of Palmer v. Commissioner, 17 T.C. 702 (1951). We do not think, in view of the facts of this case, that the making of the loans, of which petitioners have spoken in this case, was so extensive an activity as to justify a finding by this Court that petitioners were engaged in the business of lending money. Although we think petitioners did intend to profit from the loans that they made, their activities fall far short of the establishment of an income or profit-making business. Whipple v. Commissioner, 373 U.S. 193, 201 (1963). Petitioners have not proved the number and amount of loans made during the operation of this "business". Other than the advances to UAS which we found to be contributions to capital, the record shows only four loans. Further, petitioners themselves stated that, in the years prior to 1985, they had no income or expenses from this purportedly ongoing business and, as a result, did not file Schedules C. Considering this lack of evidence and the fact that it does not appear as though petitioners held themselves *340 out to the general public as lenders of money, the evidence simply does not support the finding of petitioners' being engaged in the business of lending money. See Zivnuska v. Commissioner, 33 T.C. 226 (1959); Barish v. Commissioner, 31 T.C. at 1286; Estate of Palmer v. Commissioner, supra.
Therefore, we conclude that petitioners have not sustained their burden of showing that they were engaged in the separate and distinct business of lending money and that the claimed loss of $ 13,895.77 in 1985 was a business bad debt within the meaning of section 166(a). As a result, we hold that the loss resulting from the worthlessness of the Jeffcoate loan is deductible only as a nonbusiness bad debt (short-term capital loss) under section 166(d). Rental Income
Petitioners reported $ 19,558 of rents received from an apartment complex in Bloomington, Illinois, under the column headed "Property C" on Schedule E attached to their 1985 return. In the notice of deficiency, respondent determined that petitioners received rental income in the amount of $ 20,238. Internal Revenue Agent Mary A. *341 Finfrock obtained from petitioners' accountant copies of the deposit slips of rent receipts into petitioners' bank account. From these deposit slips, she compiled a summary showing net rent receipts of $ 20,237.50, rounded up to $ 20,238. Respondent's counsel submitted as evidence Ms. Finfrock's work papers which reflect her summary of petitioners' deposit slips. Respondent's determination in the notice of deficiency is presumed to be correct, and petitioners bear the burden of proving that the determination was erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). To substantiate the amount shown on their return, $ 19,558, petitioners submitted a copy of a document entitled "Monthly Rental Income Record". The record does not disclose whether that document was contemporaneously made or is a subsequently prepared summary. Further, petitioners did not present any evidence to support any of the figures contained in that document or to explain the manner in which they determined the amount reported on their 1985 tax return. Therefore, we sustain respondent's determination of the amount of rental income received by petitioners in 1985. *342 Additions to Tax
Respondent has determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of income tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes a further addition in the amount of 50 percent of the interest due on that portion of the underpayment attributable to the negligence or intentional disregard. Respondent's determination of additions to tax under section 6653(a) is presumed correct and must be sustained unless the taxpayer can establish that he or she was not negligent. Hall v. Commissioner, 729 F.2d 632 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Petitioners bear the burden to prove that the underpayment of tax for the taxable year 1985 was not due to negligence or intentional disregard of rules or regulations. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Bixby v. Commissioner, 58 T.C. 757 (1972). "Negligence is lack of due care or failure to do what a reasonable *343 and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). A taxpayer has a duty to file complete and accurate tax returns and generally cannot avoid this duty by placing responsibility with an agent. [9]United States v. Boyle, 469 U.S. 241, 250-251 (1985); Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). However, in limited situations, a taxpayer may avoid liability for negligence if he or she furnished all of the relevant information to a tax professional or return preparer and relied upon that person's professional advice as to the proper tax treatment. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). To avoid liability a taxpayer must establish the following: (1) That he provided the return preparer with complete and accurate information from which *344 the tax return could be properly prepared; (2) that an incorrect return was the result of the preparer's mistakes; and (3) that the taxpayer in good faith relied on the advice of a competent return preparer.
Loftus v. Commissioner, T.C. Memo. 1992-266. (Citations omitted.) But, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather *345 a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. on another issue 501 U.S.     (1991). In addition, reliance upon professional advice must be reasonable. Petitioners argue that they provided full information to their accountant and that he "apparently did not use all the information that we furnished him, either in our original 1985 return or subsequently in our audit where he had our Power-of-Attorney". Further, petitioners contend that their accountant mischaracterized the nature of their personal business and "inexplicably" omitted deductions from their Schedule C for 1985. Petitioners' return was signed by a return preparer, but that individual did not appear or testify at trial. The record does not show what information or documents petitioners provided to their return preparer. Petitioners did not provide any evidence that they called the alleged discrepancies discussed above to their accountant's attention or that they discussed these issues with their accountant prior to signing and filing their return. However, irrespective of *346 such showings or lack thereof, the items and amounts claimed on the Schedule C involved purely factual matters. The facts were peculiarly within the personal knowledge of petitioners themselves and did not require the legal advice of a tax professional. We think petitioners cannot now argue that they reasonably relied on their accountant who purportedly made mistakes when petitioners could and should have detected such mistakes during even a cursory review of their return. For example, the description of the loss claimed on Schedule C was set out in all capital letters that petitioners could hardly have missed had they looked at the return. And petitioner himself should have known immediately if that was not the correct nature of the loss claimed. He should have known immediately if the description of the business was incorrect. Moreover, the Court is satisfied that petitioners' argument that they were in the business of lending money was an afterthought raised for the first time shortly before trial. Petitioners had a duty to review and question the preparation of their return prior to signing and filing it. Metra Chem Corp. v. Commissioner, 88 T.C. at 662; *347 Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), affd. 651 F.2d 1233 (6th Cir. 1981). We think petitioners' problems arise not from mistakes by their accountant, but from their own belated and shifting arguments for which there were no factual bases. We find that the total underpayment of tax for the taxable year 1985 was due to negligence. We sustain respondent's determination of an addition to tax under section 6653(a)(1) and (2) for that year. To reflect the foregoing holdings, Decision will be entered under Rule 155. Footnotes
*. 50% of the interest due on the deficiency.↩
1. Respondent has conceded that the amounts of income to be averaged on Schedule 7 (of the notice of deficiency) are incorrect as determined in the notice of deficiency. The correct amounts for averaging are $ 93,187.99 for Dale E. Magee and $ 933.80 for Ellen F. Magee. These amounts represent distributions to petitioners from the Profit Sharing Plan of United Agri-Services, Inc.
Respondent also agrees that petitioners incurred a long-term capital loss on the sale of five municipal bonds during 1985 in the amount of $ 4,755.25. Respondent concedes that this loss should be allowed in Part 3 of Schedule D of petitioners' 1985 tax return. The parties further agree that adjustments in the notice of deficiency for the married couple deduction, taxable social security, general sales tax, and medical and dental expenses are computational and are based upon the resolution of the other issues in this case.↩
2. Four other individuals, Robert L. Brown, John E. Conlin, David P. Elben, and Donald G. Weber, each purchased 100 shares of the common stock of United Agri-Services, Inc.↩
*. The parties have stipulated that the difference between the above net loss of $ 104,133 and the figure reported on the return of $ 104,434 is unknown.↩
3. The second, third, and fourth "notes" indicated above are documents resembling checks, indicating the date the money was received by UAS, the promise to pay to the order of petitioner, Mrs. Magee, or both petitioners, the interest rate per annum, when due, and the signature of Bruce T. Lang, as vice president of UAS.↩
4. In our discussion of the four purported loans to UAS, we do not, for a number of reasons, address the fact that Mrs. Magee was not a shareholder of UAS. First, the record does not establish that she in fact advanced any of her own funds to UAS. Secondly, petitioners have failed to establish that they were in a trade or business of lending money, and accordingly any deduction would be a limited nonbusiness bad debt deduction and would not change the result in this case in any event.↩
5. Tyler v. Tomlinson, 414 F.2d 844, 848 (5th Cir. 1969), sets forth a comprehensive, although not exhaustive, list of factors to be considered. See also Development Corporation of America v. Commissioner, T.C. Memo. 1988-127↩, for formulations by the various Courts of Appeals of the 11 factors or the 13 factors that have been identified.
6. In this transaction, petitioners were described as the "sellers" and the Hills as the "buyers". The Security Agreement stated that the sellers would "sign a note and borrow thirteen thousand, seven hundred dollars, which will be transferred for full payment" to UAS for the grain bin. The record does not disclose the purpose for which the additional $ 7,965 ($ 21,665-$ 13,700) was borrowed by the Hills. Petitioner did borrow the $ 13,700 from the Woodford County Bank.↩
7. No explanation was given as to why the judgment was entered against only Mr. Fenoglio.↩
8. See also Peraino v. Commissioner, T.C. Memo. 1982-524↩.
9. Petitioners suggest that the errors made in their tax return were due to the actions of their accountant. Respondent determines negligence additions against taxpayers only, not their return preparers, although respondent has the discretion to separately impose return preparer liability as well. In this case, we are limited to determining whether petitioners acted in a reasonably prudent manner in filing their return, and petitioners must demonstrate that they acted reasonably, independent of their accountant's alleged conduct. Loftus v. Commissioner, T.C. Memo. 1992-266↩.