Mary BUCHANAN and Gordon
Buchanan, Jr., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 91 C 3831.

United States District Court,
N.D. Illinois,
Eastern Division.

June 28, 1995.

John F. Lesch, Nisen & Elliott, John P. Coleman, Marshal I. McMahon, Jr., McMahon & Elliott, Eugene L. Mahoney, Eugene L. Mahoney & Associates, P.C., Chicago, IL, for Mary Buchanan, Gordon Buchanan, Jr.

Ann L. Wallace, U.S. Attorney's Office, Chicago, IL, Eugene J. Rossi, U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs Gordon and Mary Buchanan brought this federal tax refund action alleging an overpayment of their joint tax return for 1986 and/or 1987 in the amount of $542,-451. Plaintiffs claim that they are entitled to a deduction for those tax years under 26 U.S.C. § 166(d) for a nonbusiness bad debt. Plaintiffs and the defendant, the United States of America, have filed cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion is granted and the government's motion is denied.

## BACKGROUND

Plaintiffs' son-in-law, Stewart S. Peacock (Peacock) was the president and sole shareholder of a retail jewelry business called Spaulding & Company (Spaulding). For several years prior to 1986, Spaulding had taken out loans with the First National Bank of Chicago (First Chicago), which by mid–1986 totaled $1.8 million. Prior to June 1986, Spaulding and Gordon Buchanan (Gordon) were co-obligors of this debt. As collateral for Spaulding's loan, First Chicago held Gordon's 52,590 shares of Standard Oil of Ohio (Sohio).

In May 1986, First Chicago became aware that Spaulding was experiencing financial difficulties. At that time Spaulding provided First Chicago with financial statements indicating that it was essentially insolvent. Concerned with this turn of events, First Chicago threatened to call the debt and sell Gordon's Sohio shares to pay off the loan unless Gordon agreed to become the sole obligor of the Spaulding indebtedness. Around that same time First Chicago rejected, for the first time, a loan request of Spaulding. Meanwhile, Sohio was the subject of rampant takeover rumors circulating the financial world. It seemed that British Petroleum might make a tender offer for the outstanding Sohio shares at a greatly inflated rate. Thus, by June 1986, Gordon either had to become the sole obligor of Spaulding's indebtedness or lose out on a substantial amount of money if and when British Petroleum made a tender offer.

Not surprisingly, Gordon elected to become sole obligor of Spaulding's debt in June 1986. At that same time, Gordon tendered an additional 17,000 Sohio shares to secure a $300,000 loan from First Chicago, which funds he promptly turned over to Spaulding. On June 30, 1986, Gordon executed a promissory note of $2.1 million to First Chicago, a loan secured by the Sohio stock already in First Chicago's possession. Through this restructuring Spaulding was no longer obligated to First Chicago.

Gordon was anxious to retain possession of his Sohio shares so that he could capitalize on the expected tender offer from British Petroleum. As a result, he borrowed $2.1 million from a brokerage house in April 1987, and paid off Spaulding's debt. First Chicago then released Gordon's Sohio shares. One month later Gordon sold his Sohio stock to British Petroleum in a public tender offer, which generated a capital gain in the amount of $4,834,465. Gordon repaid the brokerage house $2.1 million, as well as $14,000 in interest one month later.

In June 1987, Spaulding first executed an installment note to Gordon in the amount of $2.1 million, plus interest, payable over a five-year period. Peacock guaranteed the installment note, pledging all his shares of Spaulding stock as collateral. Spaulding and Peacock also executed a security agreement giving Gordon a security interest in Spauld-

ing's inventory, accounts receivable, and stock.

Spaulding paid the required monthly payments to Gordon throughout the remainder of 1987 and up to August 1988. On November 21, 1988, Gordon filed an involuntary bankruptcy petition against Peacock and Spaulding. Subsequently, Gordon agreed to dismiss the petition after Spaulding turned over its inventory to him. On April 17, 1989, Spaulding filed a petition for voluntary bankruptcy. In this proceeding the bankruptcy court stripped Gordon of his secured status and ordered him to return Spaulding's payments made between May and August of 1988, finding that these actions were avoidable as preferences because Spaulding was insolvent at least by July 31, 1986. Gordon has since, in 1993 and 1994, recovered payments from both Peacock's and Spaulding's bankruptcy estates in the amount of $240,-628, mostly from Peacock's bankruptcy estate, and may potentially recover about $65,-000 more in the future.

On December 23, 1988, and January 5, 1989, plaintiffs filed amended returns for the 1986 and 1987 tax years respectively, claiming additional deductions for nonbusiness bad debt. The Internal Revenue Service (IRS) denied plaintiffs' claims for both years.

On June 21, 1991, plaintiffs filed this action for a federal tax refund for their joint tax returns for 1986 and 1987, claiming a deduction for a nonbusiness bad debt related to the Spaulding indebtedness. The government argues that plaintiffs are not entitled to the deduction under § 166 because they cannot prove the existence of a bona fide debt and, alternatively, because they cannot prove that that debt was completely worthless in either 1986 or 1987. Plaintiffs claim that the June 1986 restructuring of the Spaulding indebtedness created a debt from Spaulding to Gor-

don for $2.1 million and that this debt became worthless in either 1986 or 1987. The parties have filed cross-motions for summary judgment.

## DISCUSSION

### A. Section 166(d)

For plaintiffs to be successful in this refund action they must identify a specific section of the Internal Revenue Code granting them a deduction. *Harco Holdings Inc. v. United States,* 977 F.2d 1027, 1037 (7th Cir. 1992) (holding that deductions are a matter of legislative grace). Plaintiffs claim that Gordon's financial dealings with Spaulding qualify as a nonbusiness bad debt under § 166(d). Section 166(d) states:

(1) General rule—In the case of a taxpayer other than a corporation—

\*    \*    \*    \*    \*    \*

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.

26 U.S.C. § 166(d). A taxpayer seeking to take a deduction for a nonbusiness bad debt under § 166(d) must establish two elements. First, the taxpayer must establish the existence of a bona fide debt. Treas.Reg. § 1.166–1. Second, the taxpayer must establish that this bona fide debt became completely worthless during the taxable year in question. 26 U.S.C. § 166(d). In this case, the government contends that plaintiffs cannot establish either element.[1]

### B. The Existence of a Bona Fide Debt

■ The Treasury Regulations require that in order to establish the existence of a

---

1. The government argues that the supposedly inconsistent positions taken by plaintiffs in their administrative refund action and in their complaint is fatal to their cause here. The government maintains that plaintiffs argued in their administrative refund proceeding that Gordon was Spaulding's creditor, while claiming in their complaint that Gordon was Spaulding's guarantor. In making this argument, the government seizes upon the use of the word "guaranty" in plaintiffs' complaint. However, it is perfectly

clear from the rest of the complaint that plaintiffs have endeavored to prove that Gordon was Spaulding's creditor. Indeed, we did not consider it necessary for plaintiffs to amend that portion of their complaint to remove any ambiguity. In addition, inasmuch as the government concedes that at all relevant times Gordon was primarily liable to First Chicago, we find that Gordon clearly was not a guarantor and all issues regarding guarantor-taxpayers are irrelevant to this case.

bona fide debt the taxpayer must demonstrate "a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed and determinable sum of money." Treas.Reg. 1.166–1(c). Specifically excluded from the definition of a bona fide debt are gifts and contributions to capital.[2] *Id.*

■ Since Gordon does not fall into one of the specific exclusions found in Treas.Reg. 1.166–1(c), we must determine when and if a debtor-creditor relationship existed between Spaulding and Gordon. The starting point for determining whether such a relationship exists is the subjective intent of the parties to the transaction. *See Saunders v. Commissioner,* 720 F.2d 871, 873 (5th Cir.1983); *Stinnett's Pontiac Service, Inc. v. Commissioner,* 730 F.2d 634, 638 (11th Cir.1984) (holding that the intent of the parties helps determine whether a particular transaction qualifies as a debt). If the taxpayer can establish that he had a legitimate expectation of repayment, and that the alleged debtor also intended to repay the funds in question, he will ordinarily have established the existence of a bona fide debt. In addition, this subjective intent must also reconcile with the objective characteristics of the transaction. That is, the parties could have intended to create a debtor-creditor relationship but in fact failed to do so, or the objective characteristics of the transaction may indicate that the parties did not truly intend to create a debt. *Stinnett's Pontiac Service,* 730 F.2d at 639. These objective characteristics include whether the parties executed loan agreements, whether collateral was given, whether a specific period of repayment was established, whether interest was paid, the financial condition of the debtor, and whether repayment was contingent on other factors. *See Id.* at 638; 8 Mertens, *Law of Federal Income Taxation,* § 30.04 at p. 31 (1989).

■ Neither party has addressed whether this inquiry is a question of fact or law. We believe that the inquiry into whether a bona fide debt exists is a question of fact. The

critical question is the intent of the parties and the reasonableness of that intent, which are consummate questions of fact. *Accord, Saunders,* 720 F.2d at 873; *Magee v. Commissioner,* 66 T.C.M. 105, 1993 WL 262631 (1993) (recognizing a "fact and circumstances" approach to this issue); 8 Mertens, *Law of Federal Income Taxation,* § 30.04 at p. 34 (1989); *but see Texas Farm Bureau v. United States,* 732 F.2d 437, 438 (5th Cir. 1984) (holding that determining whether a particular expense is a debt or a contribution to capital is a question of law in that it does not depend on the parties' intent but on certain objective factors).

We conclude that there is no genuine issue of material fact that a debtor-creditor relationship existed in June, 1986. The plaintiffs indicated they expected repayment from Spaulding. Further, Peacock testified that Spaulding was obligated to repay Gordon $2.1 million, and the government has stipulated that Peacock did intend to repay the money. The government presents nothing of its own to contradict this evidence of subjective intent. Rather, the government claims that the lack of any formal indicia of indebtedness, such as a loan agreement or collateral, indicates that such a relationship was not created in fact. Plaintiffs, however, have successfully rebutted that argument. The government admits that Spaulding recorded in its corporate records that it owed Gordon money. Moreover, plaintiffs have shown that the $2.1 million advance was intended only to be a short-term arrangement. Peacock's testimony and records from First Chicago indicate that Gordon would become sole obligor of the debt to give Spaulding time to find another bank to pay off the First Chicago debt. The short term nature of the arrangement obviated the need to discuss interest provisions and the period for repayment. Only later, when it became clear that Spaulding would not receive a loan from a different bank, did the parties need to formalize their agreement, which they did in 1987. Finally,

---

**2.** We can quickly dispense of the government's contention that Gordon's actions were either a gift or a contribution to capital. Peacock was Spaulding's sole shareholder and therefore any monies tendered to Spaulding by Gordon cannot be characterized as a contribution to capital. In

addition, there is no evidence that Gordon intended to make a gift through restructuring Spaulding's debt. There is no indication of any donative intent, and we will not infer such intent in the absence of any evidence when the alleged gift in question is such a sizable sum.

it is undisputed that the bankruptcy court concluded that Gordon was Spaulding's creditor, and that the debt was created before 1987.[3] While this finding of the bankruptcy court is not binding on us here, it is a factor that we should consider in deciding whether a debt was created.

■ The government advances two arguments in an attempt to stave off summary judgment on this issue. First, the government claims that even if a debtor-creditor relationship was intended by the parties, there can be no bona fide debt for § 166 purposes unless that debt had value when it was created. *See Arrigoni v. Commissioner,* 73 T.C. 792, 798, 1980 WL 4529 (1980); *Markle v. Commissioner,* 17 T.C. 1593, 1952 WL 257 (1952); *Pierson v. Commissioner,* 27 T.C. 330, 1956 WL 576 (1956), *aff'd* 253 F.2d 928. This rule was developed because evidence of the *ab initio* worthlessness of a debt demonstrates that the taxpayer could not have had a reasonable expectation of repayment. However, this rule is applicable only if the taxpayer knew that the debt was worthless when he acquired it. This is so because if the taxpayer was not aware that the debt did not have value, the worthlessness of the debt does not help inform whether or not the taxpayer had a reasonable belief that he would be repaid. In this case, plaintiffs have demonstrated that Gordon believed that Spaulding could repay the $2.1 million. Since he was not an officer or shareholder of the corporation, Gordon's knowledge of Spaulding's financial condition was limited to what Peacock related to him. The evidence reveals that Peacock told both Gordon and First Chicago that he expected to get a loan from a different bank and pay off the First Chicago indebtedness, which means from Gordon's perspective, any debt he ac-

quired from Spaulding would certainly have value. The government presents nothing of its own to contradict this evidence. Therefore, since it is undisputed that Gordon believed that Spaulding could repay the loan, plaintiffs have proved the existence of a bona fide debt despite the potential *ab initio* worthlessness of that debt.[4]

■ Second, the government argues that the Supreme Court's decision in *Eckert v. Burnet,* 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911 (1931) requires us to hold that no bona fide debt was created here. In *Eckert,* the Court held that a cash-basis taxpayer who satisfies his guaranty of another's debt by tendering his own personal note for that loan, has not incurred a debt for § 166 purposes. The government argues that Gordon, who is a cash-basis taxpayer, merely substituted his personal note in satisfaction of Spaulding's loan and therefore has not incurred a bona fide debt. We disagree because here, Gordon was always primarily liable on Spaulding's debt. The government has failed to cite a single case applying *Eckert* to a situation such as this and we decline the opportunity to be the first court to so hold.

■ Since we conclude that plaintiffs have established the existence of a bona fide debt of $2.1 million, we must determine his basis in that debt. This is so because the Treasury Regulations limit a bad debt loss to "the adjusted basis prescribed by § 1.1011–1 for determining the loss from the sale or disposition of other property." Treas.Reg. § 1.166–1(d)(1). Treasury Regulation 1.1011–1 states that "[t]he adjusted basis for determining the gain or loss from the sale or disposition of property is the cost or other basis prescribed

---

3. The bankruptcy court concluded that the security agreements executed in 1987 were on account of an antecedent debt.

4. An alternate basis for our holding here is provided by *Martin v. Commissioner,* 38 T.C. 188, 1962 WL 1072 (1962). In *Martin,* the taxpayers were forced to pay off the mechanics liens on their house after their builder failed to meet his obligations. The Tax Court concluded that the taxpayers were subrogated to the rights of holder of the mechanics lien and became the involuntary creditor of their builder, and were entitled to

a nonbusiness bad debt deduction after they established that the debt was worthless. The court in *Martin* seemed to adopt the more sweeping rule that as long as the taxpayer paid off the debt of another for sound business reasons, the taxpayer should be treated as an involuntary creditor and need not ever prove that the debt had value. We need not rely on the expansive holding of *Martin* to find for plaintiffs on this issue because it is undisputed that Gordon was not aware that the debt might not have value when he acquired it.

in § 1012 or other applicable provisions of Subtitle A of the Code." Elsewhere the Regulations state that cost equals the sum of cash paid or liabilities incurred. In this case, in June of 1986 Gordon gave Spaulding $300,000 of his own money. Further, at that time Gordon incurred an additional sole $1.8 million liability to satisfy Spaulding's debt. Therefore, the sum of cash paid and liabilities incurred in 1986 totaled $2.1 million, which qualifies as plaintiffs' basis in the debt in 1986.

### C. If and When the Debt Became Completely Worthless

■ The second element a taxpayer must establish for a § 166 deduction is that the debt became totally worthless during the taxable year. It is clear from the statute that partial worthlessness does not suffice—rather, the "last vestige of value" must disappear for the debt to be deductible. *See Bodzy v. Commissioner*, 321 F.2d 331 (5th Cir.1963).

■ Generally, a claim of worthlessness requires an examination of all "pertinent evidence" impacting on the value of the debt. *See* Treas.Reg. § 1.122–2(a). The Seventh Circuit in *Cole v. Commissioner*, 871 F.2d 64, 67 (7th Cir.1989), analyzed the factors that should be considered when determining whether or not a debt became worthless in any particular taxable year.[5] Generally "[p]roof of worthlessness requires ... a showing of identifiable events demonstrating the valuelessness of the debt and justifying abandonment of hope of recovery." *Id.* Factors indicating worthlessness include

> "the debtor's serious financial reverses, insolvency, lack of assets, persistent refusals to pay on demand, ill health, death, disappearance, abandonment of business, bankruptcy, and receivership, as well as the debt's unsecured or subordinated status and expiration of the statute of limitations."

*Id.* (quoting 2 Bittker, *Federal Taxation of Income, Estates and Gifts,* ¶ 33.3, at 33–11 (1981)). On the other hand, factors indicating that a debt is not worthless include

> "the creditor's failure to press for payment (especially if the debtor is a relative of friend), willingness to make further advances, availability of collateral or guarantees by third parties, the debtor's earning capacity, minor defaults, payment of interest, and sluggish business conditions."

*Id.* (quoting 2 Bittker at 33–11). The time frame of this inquiry is important; that is, a claim of worthlessness is examined with the facts as they existed at the end of the tax year. 8 Mertens, *Law of Federal Income Taxation,* § 30.75 at p. 196 (1989). Finally, the Seventh Circuit has held that " '[w]orthlessness' is a question of fact." *Cole*, 871 F.2d at 66.

■ What do we know about the value of the debt in 1986 and 1987? We know that First Chicago thought it had value into 1986 and that Gordon thought it had value later than that. Indeed, the return amendments claiming the deduction were not filed until about the end of 1988. We must look to the circumstances as they existed in 1986 and 1987, even though those circumstances may not have been fully disclosed until later, and we should not consider the impact of any subsequent events that could not reasonably have been anticipated in 1986 and 1987. Finally, we must recognize that while the time when a debt becomes worthless may be precisely identified by an event such as a fire or an explosion, it is usually not something that can be determined with certainty. The determination of that time when hope must give way to a conclusion that there is no reasonable expectation of recovery is, ultimately, the exercise of a sound business judgment dependent upon numerous factors.

■ There is no question of fact but that Spaulding's debt to plaintiffs was worthless in 1986 or 1987. Spaulding's tax returns for 1986 and 1987 demonstrate that the company's liabilities far exceeded its assets and that the company was operating at a net loss. Tax returns from previous years demonstrate that Spaulding's steadily worsening financial condition cannot be labeled as mere-

---

**5.** While *Cole* involved a deduction for a business bad debt under § 166(a), we think the concept of worthlessness is the same for the nonbusiness bad debts deduction as for the business bad debts deduction and will therefore use the factors outlined in that opinion.

ly a period of sluggish business conditions. Rather, it is clear that it was extremely unlikely that Spaulding would ever be able to cover its ballooning debt. This conclusion is supported by many other factors. First, the bankruptcy court concluded that Spaulding was insolvent (for bankruptcy purposes) as early as 1986. Second, First Chicago, which had previously always been willing to grant Spaulding credit and upon which Spaulding depended, refused to do so for the first time in 1986 and demanded repayment of the existing debt. Third, after First Chicago refused to extend Spaulding credit, Spaulding was unable to procure financing from any other lending institution. Fourth, plaintiffs' expert testified that under generally accepted auditing standards, Spaulding was absolutely not a going concern in 1986 and had no chance of discharging its short-term debt. The government did not submit an expert's affidavit to contradict these conclusions. Fifth, plaintiffs' grandson, who was an officer of Spaulding, testified that Spaulding was having difficulties meeting its payroll obligations and had begun issuing IOU's to creditors. Sixth, it is undisputed that Spaulding was substantially behind on its payroll taxes and rent payments. Finally, a liquidation analysis at July 31, 1986, supports the view that liquidation at that point would have wiped out Spaulding's unsecured creditors, and that is Gordon's status by determination of the bankruptcy court.

■ The government responds with three arguments of its own. First, the government maintains that the debt cannot be deemed worthless because Spaulding was meeting all interest obligations on the debt until August, 1988. We agree with the government that generally a debtor's payments on the debt militate strongly against a finding of worthlessness. This case is different, however, because Spaulding was meeting its interest obligations only because of the infusion of funds from Molly's estate and because it was wrongly withholding payroll taxes. Whether the funds from Molly's estate is considered a loan, which would have increased Spaulding's indebtedness, or misappropriated, which would have resulted in taxable income which also would have increased Spaulding's and Peacock's liabilities, it is clear that Spaulding was meeting its interest obligations only by going further in debt. Thus, the fact that Molly's estate provided a temporary infusion of cash does change the fact that Spaulding's financial condition was terminal as early as 1986.

■ Second, the government alleges that the security interest granted by Spaulding, and Peacock's personal guaranty, added worth to the debt. We disagree. Plaintiffs have demonstrated that in light of Spaulding's massive indebtedness (including back taxes) there was no reasonable possibility in 1987 of payment from Spaulding's or Peacock's bankruptcy estates. As we have noted, the liquidation value of Spaulding's inventory, less liquidation expenses, plus the accounts receivable could not have expected to yield any material payment to plaintiffs. Any funds available in the bankruptcy would first be applied to pay off any unpaid taxes and penalties. *See* 11 U.S.C. § 507(a)(7) (priority for unpaid taxes). It was extremely unlikely that Spaulding would have any funds available after paying off these priority claims. Thus, Gordon's security was itself without value.

■ The government's final argument is that the debt cannot be deemed worthless because plaintiffs received distributions from Spaulding's and Peacock's bankruptcy estates. The government must be able to demonstrate that these recoveries were reasonably foreseeable at the end of the tax years in question. *Estate of Mann,* 731 F.2d 267, 277 (5th Cir.1984). A recovery on a debt does not necessarily defeat a taxpayer's claim that that debt was worthless in a prior year. In the event that a taxpayer unexpectedly recovers part of a debt that was deducted as worthless in a prior tax year, the taxpayer must report these funds as income in the years in which the unexpected recoveries occurred. *See* 26 U.S.C. § 111. However, the government has failed to create a genuine issue of fact on this issue. As was explained above, the expectation in 1986 and 1987 is that Spaulding and Peacock would never be able to repay any material portion of the debt owed to plaintiffs.

We must keep in mind that Spaulding had had the benefit of a substantial cash infusion, approximately $648,000. Peacock, as a co-trustee, withdrew that amount from Molly's estate and transferred it to Spaulding. It appears that he had no right to do so and that the government could have treated it as income both to him and to Spaulding, with a significant diminution of the assets of both for the priority payment of additional taxes. The government did not however challenge those payments. Indeed, it has not challenged the estate's claim that the debt was worthless in May 1987. There was, accordingly, an unexpected receipt by Spaulding of far more than Gordon's ultimate recovery and a potential significant tax liability of Peacock's that was never realized. When we consider, as we should, the $90,000 Gordon has expended in his efforts to collect what he has realized and expects to realize from the bankruptcy estates, the net recovery to him appears to be largely or entirely the result of the government's decisions to pursue him and not others. A fortuitous partial recovery in a later year does not however change the fact that no one could reasonably believe that the debt had any value in 1986 or 1987.

Although this is a close case, there is no disputed facts which would indicate that the debt had any value in either of the taxable years in question. Spaulding was so hopelessly insolvent in those years that the possibility of repayment was too remote to postpone a finding of worthlessness. Given all the facts as they were known in 1986 and 1987, no reasonable commercial entity would have paid anything more than a de minimis amount for the Spaulding indebtedness. If the debt has no value in the marketplace, then it is worthless for tax purposes. Therefore, we hold that the $2.1 million debt was worthless for § 166 purposes in either 1986 or 1987.

### CONCLUSION

For the foregoing reasons defendant's motion for summary judgment is denied, and plaintiffs' cross-motion for summary judgment is granted.